# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>November 30, 2017</u>

**No. A-1-CA-34843**

**ADRIAN ALARCON,**

      Petitioner-Appellee,

v.

**ALBUQUERQUE PUBLIC SCHOOLS
BOARD OF EDUCATION and
BRAD WINTER Ph.D.,
SUPERINTENDENT OF
ALBUQUERQUE PUBLIC SCHOOLS,**

      Respondents-Appellants.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Shannon C. Bacon, District Judge**

consolidated with

**No. A-1-CA-34424**

**CENTRAL CONSOLIDATED SCHOOL
DISTRICT NO.22,**

      Petitioner-Appellant,

v.

**CENTRAL CONSOLIDATED**
**EDUCATION ASSOCIATION,**

Respondent-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Alan M. Malott, District Judge**

J. Edward Hollington & Associates, P.A.
J. Edward Hollington
Albuquerque, NM

for Appellee Alarcon

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Nathan T. Nieman
K. Cameron Johnson
Albuquerque, NM

for Appellants Albuquerque Public Schools

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Arthur D. Melendres
Zachary L. McCormick
Albuquerque, NM

for Appellant Central Consolidated School District

Jones, Snead, Wertheim & Clifford, P.A.
Jerry Todd Wertheim
Roxie P. Rawls-De Santiago
Santa Fe, NM

for Appellee Central Consolidated Education Association

**OPINION**

**VIGIL, Judge.**

{1}     These consolidated cases present us with a common question: whether changes made in 2003 to the Public School Code, NMSA 1978, §§ 22-2-1 to -33-4 (except Article 5A) (1967, as amended through 2017), vest the local superintendent of a school district with plenary power and authority to act on all school personnel matters, to the exclusion of the local school board. The issue is presented in two separate contexts.

{2}     In *Alarcon v. Albuquerque Public Schools*, (No. A-1-CA-34843), (the APS appeal), the district court concluded that the discharge hearing for a certified school employee under the School Personnel Act, §§ 22-10A-1 to -39, must be conducted by the school board. The district court issued a permanent writ of mandamus to the Albuquerque Public Schools (APS) and its superintendent, directing that a proposed discharge hearing be conducted by the APS school board.

{3}     In *Central Consolidated School District No. 22 v. Central Consolidated Education Association,* (No. A-1-CA-34424), (the School District appeal), the district court affirmed the order of the Public Employee Labor Relations Board (PELRB) that the school board is required to hear and decide appeals from decisions of the school superintendent under grievance procedures set forth in the collective bargaining

agreement (CBA) negotiated between the Central Consolidated Education Association (Union) and the Central Consolidated School District (School District) pursuant to the Public Employee Bargaining Act (PEBA), NMSA 1978, §§ 10-7E-1 to -26 (2003, as amended through 2005).

{4} In both cases, the respective school boards asserted that changes made to the Public School Code in 2003 divested school boards of all authority to act on any personnel matters and vested exclusive authority to act on all personnel matters in the local superintendent. The linchpins in both cases are the 2003 revisions made to the Public School Code by H.B. 212 (House Bill 212), 46th Leg., 1st Sess., ch. 153 (N.M. 2003), which require us to engage in statutory interpretation. We first set forth our standard of review, then discuss House Bill 212 in general terms before addressing the specific arguments made in each appeal.

## I. STANDARD OF REVIEW

{5} We are required to construe statutes enacted and amended by the Legislature in both appeals. We review questions of statutory construction de novo. *See Weiss v. Bd. of Educ. of Santa Fe Pub. Sch.,* 2014-NMCA-100, ¶ 4, 336 P.3d 388. Our mandated task in construing a statute is to "search for and effectuate" the intent of the Legislature. *Id.* (internal quotation marks and citation omitted). This task begins with an examination of the actual language of the statute, "which is the primary indicator

2

of legislative intent." *Id.* "We look first to the plain language of the statute and give words their ordinary meaning unless the Legislature indicates a different one was intended, and we take care to avoid adopting a construction that would render the statute's application absurd or unreasonable or lead to injustice or contradiction." *Miller v. Bank of Am. N.A.*, 2015-NMSC-022, ¶ 11, 352 P.3d 1162 (citation omitted). When the Legislature amends a statute, we presume the Legislature is aware of existing law, including opinions of our appellate courts, and we normally presume it intends to change existing law. *Aguilera v. Bd. of Educ.*, 2006-NMSC-015, ¶¶ 19, 24, 139 N.M. 330, 132 P.3d 587.

{6}     Because we are reviewing a decision of the PELRB in the School District appeal, there is an additional dimension to our standard of review in that case. Section 10-7E-23(B) of the PEBA provides for judicial review of a final decision of the PERLB, and the standard of review to be applied is as follows:

> A person or party, including a labor organization affected by a final rule, order or decision of the board or local board, may appeal to the district court for further relief. All such appeals shall be based upon the record made at the board or local board hearing. All such appeals to the district court shall be taken within thirty days of the date of the final rule, order or decision of the board or local board. Actions taken by the board or local board shall be affirmed unless the court concludes that the action is:
>
> (1)  arbitrary, capricious or an abuse of discretion;

(2) not supported by substantial evidence on the record considered as a whole; or

(3) otherwise not in accordance with law.

*Id.* In our appellate review of whether the district court erred in affirming the PELRB's decision, we follow the same standard of review used by the district court sitting in its appellate capacity, and at the same time determine whether the district court erred. *N.M. Corr. Dep't v. AFSCME Council 18*, ___-NMCA-___, ¶ 9, ___ P.3d ___ (No. A-1-CA-34737, Sept. 5, 2017); *see Paule v. Santa Fe Cty. Bd. of Cty. Comm'rs.*, 2005-NMSC-021, ¶ 26, 138 N.M. 82, 117 P.3d 240 (stating that in administrative appeals the appellate court reviews the administrative decision under the same standard used by the district court while also determining whether the district court erred in its review); *see Regents of Univ. of N.M. v. Fed'n of Teachers*, 1998-NMSC-020, ¶ 17, 125 N.M. 401, 962 P.2d 1236 (applying the general administrative standard of review applicable to appeals from administrative agencies to an appeal from a decision of the PELRB).

{7}     Under the terms of the statute, the School Board bears the burden of demonstrating on appeal that the decision of the PELRB is "arbitrary, capricious or an abuse of discretion"; is "not supported by substantial evidence on the record considered as a whole"; or is "otherwise not in accordance with law." Section 10-7E-23(B). Our Supreme Court has recently repeated how these factors are considered on

4

appeal as follows: "An agency's action is arbitrary and capricious if it provides no rational connection between the facts found and the choices made, or entirely omits consideration of relevant factors or important aspects of the problem at hand. An agency abuses its discretion when its decision is not in accord with legal procedure or supported by its findings, or when the evidence does not support its findings. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and we neither reweigh the evidence nor replace the fact finder's conclusions with our own." *Albuquerque Cab Co. v. N.M. Pub. Regulation Comm'n*, ___-NMSC-___, ¶ 8 (No. S-1-SC-36169 & S-1-SC-36174, consolidated, Sept. 18, 2017) (alterations, internal quotation marks, and citations omitted). We apply a whole-record standard of review, and we independently review the entire record of the administrative hearing to determine if the School Board has met its burden. *See AFSCME Council 18*, ___-NMCA-___, ¶ 9. While we may give heightened deference to an agency's determination on matters that fall within its special expertise, we still apply a de novo standard of review to statutory construction. *See Albuquerque Cab Co.*, ___-NMSC-___, ¶ 8; *see also AFSCME Council 18*, ___-NMCA-___, ¶ 9 (noting that an appellate court applies a de novo standard of review when reviewing an agency's rulings on statutory construction).

## II. HOUSE BILL 212

{8} Prior to the adoption of House Bill 212 in 2003, local school boards were required by Section 22-5-4 (2002), to be involved in the day-to-day operations of school districts on an operational level. For example, school boards were required to "supervise and control" all the public schools in the school district; to apply for waivers of certain provisions of the Public School Code relating to length of school day, staffing patterns, subject area or the purchase of instructional materials; to "supervise and control" all property owned or in the possession of the school district; and to "repair and maintain" all property belonging to the school district. In addition, while the 2002 version of Section 22-5-4 provided in Subsection (C) that the local school board had the powers or duties to "delegate administrative and supervisory functions of the school board to the superintendent of schools[,]" the statute failed to specify what those functions were, and certain administrative and supervisory functions, such as the power to hire, terminate, or discharge employees, could not be delegated. Section 22-5-4 (2002). For completeness, we set forth Section 22-5-4 (2002) as it existed prior to the changes made by House Bill 212.[1]

---

[1]22-5-4. Local school boards; powers; duties.

A local school board shall have the following powers or duties:

A. subject to the regulations of the state board, supervise and control

6

all public schools within the school district and all property belonging to or in the possession of the school district;

B.  employ a superintendent of schools for the school district and fix his salary;

C.  delegate administrative and supervisory functions of the local school board to the superintendent of schools;

D.  subject to the provisions of law, approve or disapprove the employment, termination or discharge of all employees and certified school personnel of the school district upon a recommendation of employment, termination or discharge by the superintendent of schools; provided that any employment relationship shall continue until final decision of the board. Any employment, termination or discharge without the prior recommendation of the superintendent is void;

E.  apply to the state board for a waiver of certain provisions of the Public School Code . . . relating to length of school day, staffing patterns, subject area or the purchase of instructional materials for the purpose of implementing a collaborative school improvement program for an individual school;

F.  fix the salaries of all employees and certified school personnel of the school district;

G.  contract, lease, purchase and sell for the school district;

H.  acquire and dispose of property;

I.  have the capacity to sue and be sued;

J.  acquire property by eminent domain as pursuant to the procedures provided in the Eminent Domain Code [NMSA 1978, Sections 42A-1-1 to -33 (1974, as amended through 1981)];

K.  issue general obligation bonds of the school district;

7

{9} Specific to the cases before us here, before House Bill 212 was enacted, Section 22-5-4(D) (2002) provided that a local school board had the "power or duty" to:

> [A]pprove or disapprove the employment, termination, or discharge of all employees and certified school personnel of the school district upon a recommendation of employment, termination or discharge by the superintendent of schools; provided that any employment relationship shall continue until final decision of the board. Any employment,

> L. repair and maintain all property belonging to the school district;
>
> M. for good cause and upon order of the district court, subpoena witnesses and documents in connection with a hearing concerning any powers or duties of the local school boards;
>
> N. except for expenditures for salaries, contract for the expenditure of money according to the provisions of the Procurement Code [NMSA 1978, §§ 13-1-28 to -199 (1984, as amended through 2016)];
>
> O. adopt regulations pertaining to the administration of all powers or duties of the local school board;
>
> P. accept or reject any charitable gift, grant, devise or bequest. The particular gift, grant, devise or bequest accepted shall be considered an asset of the school district or the public school to which it is given; and
>
> Q. offer and, upon compliance with the conditions of such offer, pay rewards for information leading to the arrest and conviction or other appropriate disciplinary disposition by the courts or juvenile authorities of offenders in case of theft, defacement or destruction of school district property. All such rewards shall be paid from school district funds in accordance with regulations that shall be promulgated by the department of education.

termination or discharge without the prior recommendation of the superintendent is void[.]

Section 22-5-4(D) (2002). Thus, prior to 2003, the school board had the sole power to employ, terminate, or discharge an employee, and the superintendent only had power to recommend the employment, termination, or discharge of an employee. *See Daddow v. Carlsbad Mun. Sch. Dist.*, 1995-NMSC-032, ¶ 28, 120 N.M. 97, 898 P.2d 1235 (noting that under this prior version of the statute, the school board was the only entity with the power to make personnel decisions, and the limited role of the superintendent was to make recommendations before a personnel decision by the board was made).

{10} House Bill 212, sometimes referred to as the Public School Reform Act, made sweeping changes to statutes dealing with public education, and at the same time, enacted many new statutes to reform public education in New Mexico. To this end, House Bill 212 is 107 pages long and consists of 72 sections. In stating its legislative findings and purpose for enacting House Bill 212, the Legislature determined, among other findings, that one of the keys to student success in New Mexico is "a multicultural education system that . . . elevates the importance of public education in the state by clarifying the governance structure at different levels." NMSA 1978, § 22-1-1.2(B)(6) (2015). House Bill 212, section 2 enacted this as Section 22-1-1.2(B)(5). However, in 2007, the Legislature modified S.B. 561 (Senate Bill 561),

48th Leg., 1st Sess., ch. 308, Section 1 (N.M. 2007), added a new Subsection (5) and moved what was originally Subsection (B)(5) to Subsection (B)(6)). To this end:

> The [L]egislature finds further that the public school governance structure needs to change to provide accountability from the bottom up instead of from the top down. Each school principal, with the help of school councils made up of parents and teachers, must be the instructional leader in the public school, motivating and holding accountable both teachers and students. *Each local superintendent must function as the school district's chief executive officer and have responsibility for the day-to-day operations of the school district, including personnel and student disciplinary decisions.*

Section 22-1-1.2(F) (emphasis added). In accordance with these findings, House Bill 212 defined a "local school board" to mean, "the policy-setting body of a school district[,]" and a "local superintendent" to mean "the chief executive officer of a school district[.]" NMSA 1978, Section 22-1-2(H), (I) (2015). Consistent with these findings and definitions, House Bill 212 deleted Subsection (D) from Section 22-5-4 quoted above, and adopted a new statute, Section 22-5-14, setting forth powers and duties of the superintendent. House Bill 212, §§ 21, 25. Section 22-5-14 in pertinent part states:

> A.   The local superintendent is the chief executive officer of the school district.

> B.   The local superintendent shall:

> (1)   carry out the educational policies and rules of the state board [department] and local school board;

(2) administer and supervise the school district;

(3) employ, fix the salaries of, assign, terminate or discharge all employees of the school district; [and]

. . . .

(5) perform other duties as required by law, the department or the local school board.

{11} House Bill 212 clarified the powers and duties of local school boards and superintendents and structured their relationship in a familiar and well understood framework: the school board enacts policy of the school district and employs a superintendent as the chief executive officer to implement its policies in the day-to-day operations of the school district. That is, the local school board governs the school district through its authority to enact the regulations, standards, and rules under which the school district operates, and it employs the local superintendent as the highest ranking manager of the school district to implement them on an operational level in the day-to-day operations of the local school board. *Cf. Black's Law Dictionary* 289, 1345 (10th ed. 2014) (defining "chief executive officer" as "a corporation's highest-ranking administrator or manager, who reports to the board of directors" and "policy" in part as "a standard course of action that has been officially established"); NMSA 1978, § 21-7-7 (1995) ("The board of regents shall have power and it shall be its duty to enact laws, rules and regulations for the government of the

university of New Mexico. The board of regents may hire a president for the university of New Mexico as its chief executive officer and shall determine the scope of the president's duties and authority."); *State ex rel. Clark v. Johnson*, 1995-NMSC-048, ¶ 33, 120 N.M. 562, 904 P.2d 11 ("[I]t is the Legislature that creates the law, and the Governor's proper role is the execution of the laws."); *Salazar v. Town of Bernalillo*, 1956-NMSC-125, ¶¶ 8, 11, 62 N.M. 199, 307 P.2d 186 (agreeing that as the chief executive officer of the town, a mayor has power to issue orders necessary or proper for the execution and enforcement of existing ordinances, regulations, and orders of the town council).

## III.    THE APS APPEAL

{12}    This case requires us to determine whether the discharge hearing for a certified school employee under Section 22-10A-27 (Section 27) of the School Personnel Act, Sections 22-10A-1 to -39 must be conducted by the local school board or its superintendent. The district court concluded that the hearing must be conducted by the school board and issued a permanent writ of mandamus to APS and its Superintendent, Brad Winter, Ph.D., directing that a proposed discharge hearing for Adrian Alarcon (Teacher) be conducted by the APS School Board. APS appeals, and agreeing with the district court, we affirm.

## A.     BACKGROUND

{13}     During the 2014-2015 school year, APS notified Teacher, a certified licensed school instructor, of its intent to discharge Teacher from its employment pursuant to Section 27. APS also advised Teacher that he had a right to appeal the intended discharge at a discharge hearing under Section 27, and Teacher filed a timely appeal and request for a discharge hearing. APS scheduled the hearing before an assistant superintendent, and Teacher objected on grounds that he was entitled to a discharge hearing before the school board, not the superintendent. APS responded that under its interpretation of legislative intent and implementation of Section 27, its practice beginning in 2003 was for the superintendent, or the superintendent's designee to conduct the discharge hearing and issue a written decision on the employee's appeal after the hearing. Teacher responded, again objecting to the procedure imposed by APS as contrary to the "clear, specific, and unambiguous" procedures set forth in Section 27, which require the discharge hearing to be held before the school board, and not the superintendent. Teacher said that he had "no choice but to appear at the only hearing provided to him by APS, subject to objections that [the] proceedings are contrary to state law."

{14}     Instead of appearing at the hearing under the procedure dictated by APS, and before the hearing was scheduled to be held, Teacher obtained an alternative writ of

mandamus from the district court directing that the discharge hearing be held before the school board and not the superintendent, or that APS show cause for its lack of compliance and why the writ should not be made permanent. In its answer to the alternative writ, APS argued in part that the 2003 revisions to the Public School Code by House Bill 212 transferred powers previously exercised by the local school board to the local superintendent, with the result that to the exclusion of local school boards, the local superintendent has the sole authority to discharge employees. After a hearing on the merits, the district court disagreed with APS and issued a permanent writ of mandamus, directing that the discharge hearing be held before the school board, not the superintendent. The district court also ordered that Teacher remain employed by APS with all benefits and that the proposed discharge hearing be stayed during the pendency of the appeal, as stipulated by the parties. APS appeals.

**B. ANALYSIS**

{15} APS argues three reasons why it contends the district court erred, which we summarize as follows: (1) the permanent writ of mandamus disregards and renders meaningless the legislative intent of the 2003 amendments to the Public School Code, which "explicitly both divested local school boards of the authority to hire and terminate or discharge employees and vested that authority in local superintendents"; (2) the district court erred in issuing the permanent writ of mandamus because APS

14

did not have a clear legal duty to provide Teacher with a discharge hearing before the school board; and (3) the district court erred in issuing the permanent writ of mandamus because Teacher did not exhaust available plain, speedy, and adequate administrative remedies. We address each argument in turn.

**1.     Legislative Intent**

{16}     APS argues that the 2003 amendments to the Public School Code reflect a specific legislative intent to vest the local superintendent with plenary authority over all personnel decisions, thereby divesting local boards of authority to hold discharge hearings and the ultimate power to discharge employees. APS argues that this specific legislative intent was expressed when House Bill 212 deleted Subsection (D) from the enumerated powers of local school boards in Section 22-5-4 (providing that a local school board must approve or disapprove the employment, termination, or discharge of all employees of the school district) and simultaneously enacted a new statute, Section 22-5-14(B)(3), vesting the local superintendent with the power and duty to "employ, fix the salaries of, assign, terminate or discharge all employees of the school district." [Emphasis omitted.]

{17}     We conclude that APS reads House Bill 212, and the amendments it made to the Public School Code, too narrowly, without taking into account other changes made by House Bill 212 to the Public School Code, or the fact that the Legislature re-

15

codified, but did not repeal Section 27. This case involves the contemplated "discharge" of Teacher, a certified school employee. A "discharge" under the School Personnel Act is "the act of severing the employment relationship with a certified school employee prior to the expiration of the current employment contract[.]" Section 22-10A-2(A); *see* Section 22-1-2(BB) (defining a "certified school employee" as "a licensed school employee").

{18} House Bill 212 re-compiled, but did not otherwise amend, the procedure for discharging a certified school employee under Section 27 of the School Personnel Act. House Bill 212, Section 72(F) (recompiling former NMSA 1978, Section 22-10-17 (2002) as Section 27). "In the absence of a clear legislative directive to abandon existing law, we continue to apply it." *Aguilera*, 2006-NMSC-015, ¶ 24. Importantly, Section 27(A) explicitly states that a discharge may "only" occur according to the procedure it then sets forth in detail. Equally important, Section 27(A) states that a certified school employee may be discharged only for "just cause," meaning "a reason that is rationally related to an employee's competence or turpitude or the proper performance of the employee's duties and that is not in violation of the employee's civil or constitutional rights." Section 22-10A-2(G); *see Aguilera*, 2006-NMSC-015, ¶¶ 16-25 (discussing "just cause" in the context of a reduction in force policy of a school district).

16

{19}   The requirements for discharging a certified school employee under Section 27 are clear and explicit.[2] Under Section 27, the local school board is vested with

---

[2]Section 27 provides:

A.   A local school board or the governing authority of a state agency may discharge a certified school employee *only* for just cause according to the following procedure:

(1)   the superintendent *shall* serve a written notice of his intent to recommend discharge on the certified school employee in accordance with the law for service of process in civil actions; and

(2)   the superintendent *shall* state in the notice of his intent to recommend discharge the cause for his recommendation and *shall* advise the certified school employee of his right to a discharge hearing before the local school board or governing authority as provided in this section.

B.   A certified school employee who receives a notice of intent to recommend discharge pursuant to Subsection A of this section *may* exercise his right to a hearing before the local school board or governing authority by giving the local superintendent or administrator written notice of that election within five working days of his receipt of the notice to recommend discharge.

C.   The local school board or governing authority *shall* hold a discharge hearing no less than twenty and no more than forty working days after the local superintendent or administrator receives the written election from the certified school employee and *shall* give the certified school employee at least ten days written notice of the date, time and place of the discharge hearing.

D.   Each party, the local superintendent or administrator and the certified school employee, may be accompanied by a person of his choice.

17

the exclusive authority to discharge a certified school employee. Further, the school board can only discharge where "just cause" is proven by the superintendent by a preponderance of the evidence. Procedurally, the superintendent "shall" serve the employee with a written notice of his intent to "recommend" discharge, stating in the notice the cause for his recommendation, as well as informing the employee of his right to a discharge hearing "before the local school board." Section 27(A). The

E. The parties shall complete and respond to discovery by deposition and production of documents prior to the discharge hearing.

F. The local school board or governing authority shall have the authority to issue subpoenas for the attendance of witnesses and to produce books, records, documents and other evidence at the request of either party and shall have the power to administer oaths.

G. The local superintendent or administrator *shall* have the burden of proving by a preponderance of the evidence that, at the time of the notice of intent to recommend discharge, he had just cause to discharge the certified school employee.

H. The local superintendent or administrator *shall* present his evidence first, with the certified school employee presenting his evidence thereafter. The local school board or governing authority *shall* permit either party to call, examine and cross-examine witnesses and to introduce documentary evidence.

I. An official record *shall* be made of the hearing. Either party may have one copy of the record at the expense of the local school board or governing authority.

J. The local school board *shall* render its written decision within twenty days of the conclusion of the discharge hearing.
(Emphasis added.)

employee "may" exercise his right to a discharge hearing before the school board by giving written notice of that election, Section 27(B), and if the employee makes that election, the school board "shall" hold a discharge hearing. Section 27(C). At the hearing, the superintendent "shall" have the burden of proving that, at the time of the notice of intent to recommend discharge, he "had just cause to discharge the certified school employee." Section 27(G). The superintendent "shall" present his evidence first, followed by the certified school employee's proof. Section 27(H). After hearing and considering the evidence, "the local school board shall render its written decision[.]" Section 27(J); *see Larsen v. Bd. of Educ.*, 2010-NMCA-093, ¶ 7, 148 N.M. 920, 242 P.3d 487 (describing in general terms the statutory process under Section 27 for discharging a certified school employee). This framework is consistent with the roles assigned to school boards and superintendents by House Bill 212, and corresponds with both the duty of the superintendent to carry out the rules of the school board and the power of the school board to adopt and interpret its own rules.

{20}    We also note that prior to the adoption of House Bill 212 in 2003, a hearing before the school board was always required for a discharge to take place, because the 2002 version of Section 22-5-4, quoted in footnote 1, directed that the school board had the exclusive authority to employ, terminate, or discharge a school employee, and that "any employment relationship shall continue until final decision

19

of the board." Under Section 22-5-14(B)(3), if a certified school employee does not exercise his right to a hearing, the discharge now becomes effective without the necessity for school board action. In addition, before the Public School Code was amended in 2003 by House Bill 212, *no* employee could be employed, terminated, or discharged without the express approval of the school board. Under Section 22-5-14(B)(3), subject to any other laws or requirements that may apply, the superintendent has authority to employ, terminate and discharge all *noncertified* school employees of the school district without school board approval. However, the procedural and substantive rights contained in Section 27 are a legislative expression that the discharge of a certified school employee is anything but a managerial task to be performed by the superintendent in the day-to-day operations of the school district.

{21} Discharging a teacher in the middle of the school year is significant because a teacher may not have an opportunity to find other employment, causing extreme hardship to the teacher. *See Aguilera*, 2006-NMSC-015, ¶ 32. Certified school employees have historically been accorded procedural and substantive rights by the Legislature to encourage individuals to enter the profession of teaching our children and to protect educators in their employment. *See id.* ¶¶ 8-15 (discussing statutory and jurisprudential goals of teachers' tenure statutes). These goals are expressed in the Public School Code, where the Legislature finds that one of the keys to student

20

success in New Mexico is to have a multi-cultural system that "attracts and retains quality and diverse teachers[.]" Section 22-1-1.2(B)(1). In recognition of the realities attending a discharge in the middle of the school year, and consistent with its commitment to protect the rights of certified school employees, we conclude that the Legislature consciously left intact the procedural and substantive protections of Section 27, and that it intended those protections to co-exist with Section 22-5-14.

{22} For all the foregoing reasons, we reject the argument made by APS that there is an irreconcilable conflict between Section 22-5-14 on the one hand, and Section 27, on the other hand. Section 27 under the Personnel Act and Section 22-5-14(B)(3) under the Public School Code can be construed in harmony with each other. *See Miller*, 2015-NMSC-022, ¶ 12 (stating that we consider statutes dealing with the same general subject together, in a way that facilitates the achievement of their respective goals when possible); *Luboyeski v. Hill*, 1994-NMSC-032, ¶ 10, 117 N.M. 380, 872 P.2d 353 ("Whenever possible, we must read different legislative actions as harmonious instead of as contradicting one another."); NMSA 1978, Section 12-2A-10(A) (1997) ("If statutes appear to conflict, they must be construed, if possible, to give effect to each.").

{23} We also reject the argument that House Bill 212 repealed, by implication, Section 27. The repeal of an earlier statute by implication is not favored, and we

21

strive to construe statutes harmoniously with each other when possible. *See State ex rel. Brandenburg v. Sanchez*, 2014-NMSC-022, ¶¶ 11, 17, 329 P.3d 654. There must be more than a mere difference in the provisions in order for a later statute to be construed as repealing an earlier statute. *See Alvarez v. Bd. of Trs. of La Union Townsite*, 1957-NMSC-022, ¶ 10, 62 N.M. 319, 309 P.2d 989. "There must be what is often called such a positive repugnancy between the provisions of the old and the new statutes that they cannot be reconciled and made to stand together." *Id*.; *see Stokes v. N.M. Bd. of Educ.*, 1951-NMSC-031, ¶ 5, 55 N.M. 213, 230 P.2d 243 (stating that a statute is repealed by implication when the latter statute is so inconsistent with and repugnant to the former law on the same subject as to be irreconcilable with it, "and especially does this result follow where the latter act expressly notices the former in such a way as to indicate an intention to abrogate").

{24}     In its final argument, APS refers us to two pages from a publication that was apparently issued in June 2003 by the Department of Education (now known as the Public Education Department) and the Legislative Education Study Committee. The document is entitled, "HB 212 Public School Reform[:] Questions & Answers for School Districts and Constituents By Section" and two pages from the document are attached as an exhibit to APS' answer to the alternative writ of mandamus.Therein, an unknown author states that the words "local superintendent" should be substituted

for the words "local school board" wherever they appear in Section 22-10-17 (2002), which we have already noted, is now codified as Section 27. While conceding that the document itself is not a formal rule or regulation, APS contends that it is tantamount to an agency rule or regulation entitled to deference in interpreting Section 27. The document was not admitted into evidence at the hearing on the merits, and it is not the subject of any stipulation by the parties. Without any information concerning the document, such as how it came about, why it was published, or who wrote it, we do not further consider the two pages from the document. We would otherwise be speculating on their significance on how they relate to the question of legislative intent before us.

**2.     Clear Legal Duty to Provide a Hearing**

{25}     APS argues that the district court erred in issuing the permanent writ of mandamus because "[APS did] not have a clear legal duty to provide [Teacher] with a discharge hearing before the [s]chool [b]oard[.]" *See* NMSA 1978, Section 44-2-4 (1884) (stating that mandamus may issue to a board or person "to compel the performance of an act which the law specially enjoins as a duty"); *see generally Mimbres Valley Irrigation Co. v. Salopek*, 2006-NMCA-093, ¶¶ 10-15, 140 N.M. 168, 140 P.3d 1117 (describing in general how the statutes governing mandamus operate).

{26} We generally review the granting or denial of a writ of mandamus under an abuse of discretion standard. *See State ex rel. Stapleton v. Skandera*, 2015-NMCA-044, ¶ 5, 346 P.3d 1191. However, within that context, we are required to interpret Section 27, as well as the statutes relating to a writ of mandamus. Our review is therefore de novo. *See Weiss*, 2014-NMCA-100, ¶ 4.

{27} We begin with Section 27. We have already quoted and described the operation of Section 27. The mandatory obligation given to superintendents and school boards on the procedure to follow before a certified school employee can be discharged could not be more clearly stated. The school board "shall" hold a discharge hearing once a certified school employee demands a hearing. There is no option. And there is no room for interpretation. APS argues that the Legislature "unequivocally divested" and "eradicated" a school board of authority to discharge employees, and invested "exclusive authority" in the superintendent to discharge school personnel such as Teacher. We have already answered those arguments.

{28} For additional support of its argument that it had no clear legal duty to provide Teacher with a discharge hearing before the school board, APS asks us to consider two additional attachments to its answer to the alternative writ. One of the exhibits is a decision and order issued by the secretary of education suspending the "Board of Education of the Questa Independent School District." Nothing in this decision and

24

order requires or allows a certified school employee's discharge hearing to be held before the superintendent. The second exhibit consists of the findings of fact and conclusions of law of an independent arbitrator following a de novo hearing held under Section 22-10A-28 (providing that an appeal from a discharge hearing before the school board lies with an independent arbitrator who conducts a de novo hearing). A de novo hearing is an entirely new hearing that is conducted as if there had been no prior hearing. *See State ex rel. Bevacqua-Young v. Steele*, ___-NMCA-___, ¶ 9, ___ P.3d ___ (No. A-1-CA-34882, July 17, 2017). Therein, the arbitrator concluded that the procedure utilized by APS to hold a discharge hearing before the superintendent does not violate Section 27, on the basis that Section 27 and 22-5-14 are in "direct conflict" with one another. The arbitrator did no analysis, and again, this decision does not require APS to direct that discharge hearings be held before the superintendent. To the extent APS is arguing that because it previously ordered that the discharge hearing of a certified school employee be conducted by the superintendent, it is now required to do so in all cases, we are not persuaded.

{29} Section 27 is clear in its mandate that a discharge hearing is to be conducted before the school board, where the superintendent has the burden of proving that, at the time of the notice of intent to recommend discharge, the superintendent had just cause to discharge the certified employee. Section 22-5-14 does not unequivocally

divest the school board from conducting a discharge hearing, and Section 22-5-14 can be applied harmoniously with Section 27. APS had a clear, legal duty under Section 27 to provide Teacher with a discharge hearing before the school board, and it had no authority by regulation or otherwise, to violate the clear, unequivocal mandate of Section 27. The discretion otherwise afforded the Public Education Department and APS "may not justify altering, modifying or extending the reach of a law created by the Legislature." *State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶ 22, 125 N.M. 343, 961 P.2d 768. *See In re Adjustments to Franchise Fees*, 2000-NMSC-035, ¶ 19, 129 N.M. 787, 14 P.3d 525 (stating that "[w]ith respect to the principle of separation of powers, an unlawful conflict or infringement occurs when an administrative agency goes beyond the existing New Mexico statutes or case law it is charged with administering and claims the authority to modify this existing law or to create new law on its own" (internal quotation marks and citation omitted)); *Chalamidas v. Envtl. Improvement Div.*, 1984-NMCA-109, ¶ 13, 102 N.M. 63, 691 P.2d 64 (stating that "[a]n agency cannot amend or enlarge its authority through rules and regulations.").

{30}     We therefore reject the argument of APS that it did not have a clear, legal duty to provide Teacher with a discharge hearing before the school board.

**3.     Failure to Exhaust Administrative Remedies**

{31}     For its last argument, APS contends that because Teacher did not attend the

26

discharge hearing before the superintendent, and then appeal, the writ of mandamus was improper because Teacher failed to exhaust the plain, speedy, and adequate administrative remedies available to him. *See* NMSA 1978, § 44-2-5 (1884) ("The writ [of mandamus] shall not issue in any case where there is a plain, speedy and adequate remedy in the ordinary course of law."). Because this argument also presents us with a question of statutory construction, our review is de novo. *See Weiss*, 2014-NMCA-100, ¶ 4.

{32}  APS argues that because Teacher could appeal an adverse decision from a discharge hearing conducted by the superintendent to an independent arbitrator who hears the case de novo, and from there, to the district court under Section 22-10A-28, Teacher had a plain, speedy, and adequate remedy at law, which he failed to pursue, and Teacher was therefore not entitled to a writ of mandamus. For the same reason, APS argues that the district court was precluded from exercising subject matter jurisdiction over the mandamus action. We disagree with both assertions.

{33}  APS' argument overlooks Teacher's assertion from the very beginning: that he was entitled to a discharge hearing before the school board, a substantive and procedural right afforded to all certified public school employees by the Legislature under Section 27. APS was acting ultra vires (unauthorized and beyond its power) in directing Teacher to appear at the discharge hearing before his accuser, the

superintendent, rather than before the school board, as required by Section 27. No de novo appeal before an independent arbitrator, and from there, to the district court, will restore Teacher to the substantive and procedural right to a discharge hearing before the school board provided by Section 27.

{34}    The constitutional right to a pre-termination hearing afforded all school employees under *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), includes the right of an employee to present his or her side of the case because of its obvious value in reaching an accurate decision on a proposed termination. *See id.* at 543. "Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Id.* Under New Mexico law, this means having a fair opportunity to invoke the discretion of the individual or body charged with the pre-termination decision. *See City of Albuquerque v. Chavez*, 1998-NMSC-033, ¶ 15, 125 N.M. 809, 965 P.2d 928. Here, the Legislature has mandated that the discretion lies with the school board, not the superintendent, and with good reason. At the very least, there is an appearance of impropriety in requiring an employee, such as Teacher, to appear before his accuser, the superintendent. The Legislature left this decision to the elected members of the local board of education, who can take a more dispassionate view of the evidence and

decide if an employee's conduct warrants a discharge or some lesser sanction. When an employee, such as Teacher, is denied his rights under Section 27, an "impermissibly high risk" exists that the employee will be erroneously terminated. *See Chavez*, 1998-NMSC-033, ¶ 15.

{35} In addition, our case law does not require Teacher to appear in a hearing that is contrary to the requirements of Section 27, and then appeal, in lieu of seeking a writ of mandamus. We begin with our holding that Section 27 absolutely affords Teacher the right to a discharge hearing before the school board. In *Franco v. Carlsbad Municipal Schools*, 2001-NMCA-042, ¶¶ 4, 6-8, 130 N.M. 543, 28 P.3d 531, a tenured, non-certified school employee was terminated, but not advised of his right to appear before the school board at a pre-termination hearing to give the board his explanation of why he should not be terminated. After the employee was awarded damages in a wrongful termination suit, the school district appealed, arguing that the district court erred in allowing the suit to go forward because the employee had failed to exhaust his administrative remedies. *Id*. ¶ 2. Rejecting this argument, this Court said that the issue was not whether the school district would have afforded the employee his right to a hearing before the school board or arbitration had he requested it, but whether the school district "thwarted" the school employee's ability to invoke those rights by not giving him notice of those rights. *Id*. ¶ 17. What we said

in *Franco* applies here:

> Actions to terminate constitutionally protected rights must be conducted with scrupulous fairness. Such was not the case in the matter before us. [The employee] was terminated by the [d]istrict without being afforded the mandatory pre-termination or post-termination process to which he was entitled. Exhaustion of administrative remedies, as a precursor to [the employee's] suit for damages, was not required because the [d]istrict, by its actions, deprived [the employee] of his right to initiate and sustain the administrative process mandated by statute—a process which would have provided him with a meaningful opportunity to challenge the grounds for termination.

*Id.* ¶ 20 (citation omitted). Here the school district insisted that Teacher not be given the hearing he was entitled to receive under Section 27. Proceeding as the school district insisted would not have restored Teacher to the hearing he was entitled to receive.

{36} *Sanchez v. Board of Education*, 1961-NMSC-081, ¶¶ 1-4, 68 N.M. 440, 362 P.2d 979, involved a dispute between a teacher and the local school board over whether he had been dismissed. The teacher sought a writ of mandamus to compel his reinstatement, which the district court granted. *Id.* ¶ 1. As in this case, the teacher was entitled to be served with a notice of dismissal in which the school board specified its reasons to terminate the teacher, followed by a hearing before the local school board *Id.* ¶ 7. Pertinent to the issue before us here, our Supreme Court said, "It should be apparent that, under the circumstances here present, there must be a notice of dismissal containing the causes therefor, and a hearing in conformity with the law.

A refusal to grant him such a hearing would probably warrant the granting of a writ of mandamus to require a hearing, but such was not the relief sought nor granted. Such a remedy may still be available should the board continue to refuse to follow the clear direction of the statute." *Id.* ¶ 8. Because the teacher in *Sanchez* had not followed the required statutory procedure, our Supreme Court concluded that dismissal of the teacher's suit was proper. *Id.* ¶¶ 14, 17. Here, in contrast, Teacher enforced his statutory right to a hearing before the school board as provided by Section 27 by seeking and obtaining a writ of mandamus.

{37} Finally, in *Stapleton v. Huff*, 1946-NMSC-029, ¶ 2, 50 N.M. 208, 173 P.2d 612, *superseded by statute as stated in Sanchez*, 1961-NMSC-081, the teacher had been a certified school employee for twenty-two years. *Stapleton*, 1946-NMSC-029, ¶ 2. After being advised that his contract would not be renewed, the teacher appeared at a hearing before the local school board, then appealed to the state board of education. *Id.* ¶ 3. In neither hearing was the teacher afforded his statutory right to confront and cross-examine the witnesses against him. *Id.* ¶¶ 3-4. After concluding that by appealing to the State Board of Education, the teacher waived the errors committed by the local school board, *id.* ¶ 10, our Supreme Court said that the teacher was deprived of his right to the hearing that was statutorily required before the State Board of Education. *Id.* ¶ 13. Our Supreme Court said, "What the [teacher] has been

31

denied is the hearing before [the] State Board of Education to which he was entitled under the law. This being a clear legal right is enforcible by mandamus[.]" *Id*. ¶ 14. This holding was consistent with *Brown v. Romero*, 1967-NMSC-057, 77 N.M. 547, 425 P.2d 310. In *Brown,* a teacher sued a local school board and the state board of education for breach of tenure rights and for a de novo trial on the issue of her tenure rights, when her own pleadings disclosed that she was denied her statutory rights to a hearing before the local school board and the state board of education. *Id*. ¶¶ 1-5. Our Supreme Court said, "Mandamus was available as a remedy to test [the teacher's] right to a hearing before the governing board." *Id*. ¶ 8.

{38}     Teacher had a clear statutory right to a hearing to contest his pending discharge before the School Board just like the teachers in *Stapleton* and *Brown*, and under the circumstances, a writ of mandamus was a proper vehicle for protecting that right. As a result, Teacher was not required to appear at the proposed discharge hearing before the superintendent, and then appeal before an arbitrator for a de novo hearing, followed by a limited appeal to the district court in lieu of seeking and obtaining the writ of mandamus.

**C.     RESULT**

{39}     For all the foregoing reasons, we conclude that the district court did not err in issuing the permanent writ of mandamus to APS.

32

## IV.    THE SCHOOL DISTRICT APPEAL

{40}    Pursuant to PEBA, Sections 10-7E-1 to -26, the Union and the School District entered into a CBA in 2012 to provide terms and conditions of employment for all certified school employees, all transportation employees, and all educational support professionals of the School District (the bargaining unit). This appeal requires us to determine whether the changes made to the Public School Code by House Bill 212 prohibit the school board of the School District from hearing and deciding the Union's grievance pursuant to the grievance procedure negotiated by the parties in the CBA.

## A.    BACKGROUND

### 1.    Proceedings Before the PELRB

{41}    The Union filed a complaint with the PELRB alleging: (1) that the school board of the School District failed and refused to process grievances as required by the CBA in violation of the PEBA (grievance complaint); and (2) that the School District gave certain employees additional work and paid them an additional "foreman" stipend, thereby changing the terms and conditions of their employment without bargaining with the Union as required by the PEBA (foreman stipend complaint). *See* Section 10-7E-9(A)(3) and (F) (providing that the PELRB has the power to enforce the PEBA, and to this end, may establish rules necessary for the

33

filing, hearing of, and determination of complaints of practices prohibited by the PEBA).

{42} In its answer to the grievance complaint, the School District asserted the defense that revisions made in 2003 to the Public School Code by House Bill 212 transferred powers from the school board to the superintendent of the school district, with the result that the school board had no authority to hear and decide grievances. In its answer to the foreman stipend complaint, the School District admitted that three existing employees agreed to take on additional responsibilities for an additional stipend, but denied that there was a PEBA violation because no new foreman positions were created. In addition, the School District argued that if bargaining was required, the Union waived the failure to bargain because it agreed to, and acquiesced in, the School District's long practice of paying additional stipends to employees to perform additional tasks beyond those inherent in their base job.

{43} An evidentiary hearing lasting more than twelve hours was held before the designated hearing officer, Thomas J. Griego. *See* Section 10-7E-12(C) (providing that the PELRB may appoint a hearing examiner to conduct an adjudicatory hearing in a dispute on whether there has been a violation of the PEBA). After the parties submitted their respective requested findings of fact and conclusions of law, the hearing officer filed a detailed thirty-nine-page report and recommended decision,

setting forth his findings of fact, reasoning, and conclusions of law. The hearing officer found in favor of the Union on both complaints. The hearing officer rejected the School District's defenses and concluded that the School District committed prohibited labor practices under the PEBA when: (1) the school board refused to review grievances appealed to the school board pursuant to the negotiated grievance procedure contained in the CBA; and (2) the School District gave three employees in the bargaining unit additional work and paid them an additional "foreman" stipend without bargaining those changes with the Union.

**2.      The Grievance Complaint**

{44}      The hearing officer found that the parties negotiated a CBA in which they agreed upon procedures for filing and processing grievances. The grievance procedure has five steps. Each succeeding step is followed if the preceding step does not resolve the issue. We summarize those steps as follows: Step 1: the "discussion level" in which a grievant meets with the immediate supervisor to attempt resolving the issue; Step 2: the "supervisor level" in which a written grievance is submitted to the immediate supervisor, and the supervisor communicates a written decision in writing; Step 3: the "superintendent level" which is invoked by appealing the immediate supervisor's decision in writing to the superintendent who renders a written decision after meeting with the grievant and the supervisor and reviewing the

35

record and information presented; Step 4: the "board level" which is invoked by appealing to the school board through the superintendent; and Step 5: the "arbitration level" after the school board renders its decision, in which the arbitrator conducts a hearing and renders a final and binding decision.

{45} The question before the hearing officer was whether the school board complied with Step 4 at the school board level. The CBA provides that if the Union "is not satisfied" with the superintendent's decision, the Union "may appeal" to the board of education "through the [s]uperintendent." The CBA further specifically provides that at Step 4:

> The [school b]oard will review the grievance and, at the [school b]oard's discretion, the [Union] may be invited to appear before the [s]uperintendent and the [school b]oard at their initial or subsequent meeting to present its position and respond to question[s]. The [Union] shall be advised in writing of the decision of the [school b]oard within thirty (30) days of the [school b]oard's receipt of the request for review.

The hearing officer first rejected the School District's defense that the school board had no authority to hear and decide grievances as required by Step 4 because amendments to the Public School Code enacted by House Bill 212 in 2003 transferred certain duties from the school board to the superintendent. Secondly, the hearing officer found that the School District failed to comply with its duties under Step 4.

{46} The hearing officer found that the school board adopted a blanket policy to send all grievances brought before it back to the superintendent. The hearing officer

36

further found that, consistent with the blanket policy, the School District violated Step 4 multiple times. In one instance, the school board placed a grievance on its agenda but took no action on the grievance and did not issue a written decision concerning the grievance to the Union. In a second instance, the superintendent refused to place a filed appeal on the school board's agenda because he summarily dismissed it himself without advising the board members; and in a third instance, the school board refused to review an appeal because the Union had also filed a prohibited practices complaint regarding the same issue.

{47} The hearing officer concluded that by refusing to review grievances appealed to the school board under Step 4 of the negotiated grievance procedure, the School District committed a prohibited practice in violation of Section 10-7E-19(G) and (H) of the PEBA (providing that it is a violation of the PEBA to "refuse or fail to comply with a provision of the [PEBA] or [PELRB] rule" and to "refuse or fail to comply with a [CBA]").

**3. The Foreman Stipend Complaint**

{48} The hearing officer found that the School District designated three bargaining employees as "transportation foreman" and made changes to their duties, hours, and pay, without bargaining with the Union, in violation of the PEBA. The hearing officer also rejected the School District's defense that the Union waived the failure to

bargain on grounds that the Union had acquiesced in the historical practice of "management unilaterally establishing stipends and to whom they [would] be paid." To the contrary, the hearing officer found, in the CBA, that the Union and the School District had entered into a memorandum of understanding to create a joint committee to review the requirements to be met for an employee's "increment, stipend, or activity allowance."

{49} The hearing officer also made a specific finding that the "facts negate the [School] District's claim of waiver." The hearing officer concluded that evidence presented by the School District established that most of the stipends the School District referred to were of employees outside the Union's bargaining unit. As for those employees who were in the bargaining unit and received stipends, the hearing officer found that "there is no evidence to support the proposition that the [U]nion was made aware of the payment of those stipends and given an opportunity to bargain them, a pre-requisite to waiver."

{50} The hearing officer concluded that by giving three bargaining unit employees additional work and paying them an additional "foreman" stipend without bargaining those changes with the Union, the School District committed a prohibited practice in violation of Section 10-7E-19(F) and (G) of the PEBA (stating it is a violation of the PEBA "[to] refuse to bargain collectively in good faith with the exclusive

representative[,]" and "[to] refuse . . . to comply with a provision of the [PEBA] or [PELRB] rule[.]").

{51} The School District appealed from the conclusions of the hearing officer and the findings of fact supporting them to the PELRB. The PELRB voted unanimously to adopt the hearing officer's findings of fact, conclusions of law, and rationale as its own. *See* Section 10-7E-9(D) (providing that the PELRB shall decide issues by majority vote and shall issue its decisions in the form of written orders and opinions).

**B.      PROCEEDINGS BEFORE THE DISTRICT COURT**

{52} The School District next appealed the decision of the PELRB to the district court. *See* Section 10-7E-23(B) (providing that a person or party affected by a final order or decision of the PELRB may appeal to the district court); Rule 1-074 NMRA (setting forth the procedure for an administrative appeal to the district court). After the School District filed its statement of appellate issues, the Union responded, and the School District filed its reply to the Union's response, the district court held a hearing. Following the hearing, the district court filed a memorandum opinion and order affirming the order of the PELRB.

{53} Like the hearing officer and the PELRB, the district court concluded that the 2003 amendments to the Public School Code did not prohibit the school board from performing its duties at Step 4 of the CBA. The district court further determined that

39

the School District contractually obligated itself to review the superintendent's decision when his decisions were appealed pursuant to Step 4 of the CBA grievance process. Because "[a]n appeal, to be meaningful, involves the exercise of independent judgment as to whether the decision rendered by the superintendent is correct[,]" and the School District failed to point to any evidence that the school board was providing meaningful review at Step 4, the district court concluded that the hearing officer's conclusion (adopted by the PELRB) that the School District violated the CBA was not arbitrary and capricious.

{54} In the district court, the School District no longer argued that it was not required to bargain with the Union the changes it made to the terms and conditions of employment to certain employees by giving them additional duties and paying them an additional foreman stipend. Instead, the Union relied on its defense that the Union had waived the failure to bargain. On this point, the district court found that substantial evidence supported the hearing officer's (and PERB's) finding that there was no waiver by the Union.

{55} The School Board filed a petition for writ of certiorari with this Court, which we granted. *See* Rule 12-505 NMRA (setting forth procedure for review by the Court of Appeals of decisions of the district court from administrative appeals). The issues presented are: (1) whether the 2003 revisions made to the Public School Code by

40

House Bill 212 stripped the school board of authority to hear and decide grievances as provided in the CBA; and (2) whether substantial evidence supports the finding of the PELRB that the Union did not waive its right to bargain the changed terms and conditions of employment of employees who were given additional duties and paid an additional stipend by the School District.

**C. ANALYSIS**

{56} The School District's argument is grounded on the same amendments made to the Public School Code by House Bill 212 that APS relies on in its appeal. To reiterate, House Bill 212 enacted a new statute, Section 22-5-14 (Section 14) which gives the superintendent the powers to "administer and supervise the school district" and to "employ, fix the salaries of, assign, terminate or discharge all employees of the school district[.]" Section 14(B)(2), (3). Secondly, House Bill 212 deleted Section 22-5-4(D) (providing that a local school board was invested with the "powers or duties" to "approve or disapprove the employment, termination, or discharge of all employees and certified school personnel of the school district upon a recommendation . . . by the superintendent") from the enumerated powers and duties of a school board. The School Board contends that because of the powers given to superintendents, and because the school board is "given no authority with respect to school personnel" that

"[t]he Legislature took away the power of school boards to interfere in personnel matters when it enacted [House Bill] 212."

{57}    We address the School District's argument within the context of the PEBA, which like House Bill 212, was enacted by the Legislature in 2003. Public Employees were not given the right to engage in collective bargaining until 1992 when the Legislature enacted the PEBA for the first time. 1992 N.M. Laws, ch. 9; *see Regents of Univ. of N.M.*, 1998-NMSC-020, ¶ 3 (noting that with the passage of the PEBA in 1992, public employees in New Mexico were given the right to engage in collective bargaining for the first time). However, the 1992 version of PEBA had a sunset provision that took effect in 1999, seven years later. 1992 N.M. Laws, ch. 9, § 30. Four years later in 2003, New Mexico once again recognized the right of public employees to engage in collective bargaining with the passage of the PEBA for the second time. 2003 N.M. Laws, ch. 4, § 1. (We also note that with the passage of 2003 N.M. Laws, ch. 5, the Legislature also enacted the PEBA again. Several sections of Chapter 5 are identical to those contained in Chapter 4, and these are noted in the Compiler's notes to the statutory sections. ) The 2003 version of the PEBA is the current version and is codified at §§ 10-7E-1 to -26. *See* 2005 N.M. Laws, ch. 333, § 1 (adding the statutory reference).

{58} One of the stated purposes of the PEBA "is to guarantee public employees the right to organize and bargain collectively with their employers," Section 10-7E-2. "Collective bargaining" is defined to mean "the act of negotiating between a public employer and an exclusive representative for the purpose of entering into a written agreement regarding wages, hours and other terms and conditions of employment[.]" Section 10-7E-4(F). The parties to collective bargaining are the "exclusive representative" of the public employees and the "appropriate governing body" of the public employer. Section 10-7E-17(A). The "exclusive representative" is "a labor organization that, as a result of certification, has the right to represent all public employees in an appropriate bargaining unit for the purposes of collective bargaining[.]" Section 10-7E-4(I). "The appropriate governing body of a public employer is the policymaking individual or body representing the public employer[,]" and "[a]t the local level, the appropriate governing body is the elected or appointed representative body or individual charged with management of the local public body." Section 10-7E-7.

{59} Consistent with its definition of "collective bargaining," the PEBA mandates that with the exception of certain retirement programs, exclusive representatives and public employers "shall bargain in good faith on wages, hours and all other terms and conditions of employment and other issues agreed to by the parties[,]" and the parties

43

"shall enter into written collective bargaining agreements covering employment relations." Section 10-7E-17(A)(1), (2). Pertinent here, "An agreement shall include a grievance procedure to be used for the settlement of disputes pertaining to employment terms and conditions and related personnel matters." Section 10-7E-17(F).

**1.      Authority of the School Board to Hear and Decide Grievances**

{60}      With the foregoing background in mind, we now examine the School District's arguments in detail. Specifically, the School District argues that under Step 4 of the grievance procedure in the CBA in an appeal from the decision of the superintendent, a school board is impermissibly allowed to overrule the superintendent, contrary to Section 14 which states that "[p]ersonnel decisions are in the domain of the [s]uperintendent, not the [s]chool [b]oard." Further, the School District asserts, because Section 14 vests all hiring and firing authority with the superintendent, if the school board has authority to overrule the superintendent at Step 4 of the grievance process, "then the actual power to hire and fire was never actually changed." This result, the School District argues, violates two principles of statutory construction: (1) that the Legislature does not intend to enact a nullity when it passes a new law; and (2) that an amendment to an act expresses a legislative intent that the amendment prevails over any remaining contradictory provisions because it is a later declaration

44

of legislative intent, and in adopting the amendment, the Legislature is presumed to have intended to change existing law.

{61}     The School District's arguments focus on Section 22-5-4(A), which provides that a local school board has the power or duty, "subject to the rules of the department, [to] develop educational policies for the school district." While conceding that the school board is a "policy-making body," the School District asserts that under the foregoing language, the school board "only has the legal authority to make policies which are . . . subject to the rules of the department, and . . . 'educational.' " Thus, the School District proclaims, the school board "is not given authority to make whatever policies it may choose on whatever subjects it may choose." The School District asserts that because the "policies" involved here—grievances under the CBA—are "labor or personnel matters, not educational issues" and because House Bill 212 "took the local school boards out of the personnel arena, except for one employee—the superintendent[,]" the school board had no authority to negotiate and sign the CBA. We are not persuaded.

{62}     The School District's argument overlooks the fact that in addition to other changes discussed above, House Bill 212, Section 3 also enacted Section 22-1-2(H), which defines the school board as the "policy-setting body" of the school district. Simply stated, "policy" means "to organize and regulate the internal order of:

Govern." *Webster's Third New Int'l Dictionary* (Unabridged ed. 2002). As we have already pointed out, House Bill 212 reformed and restructured the relationship between the school board and superintendent, and consistent with this purpose, House Bill 212 clarified the respective duties of the school board and the superintendent. Under House Bill 212, the school board governs the school district by exercising its power to enact policy through the adoption of regulations, standards, and rules. At the same time, the school board employs the superintendent as its chief executive officer to implement and carry into effect at an operational level in the day-to-day operations of the school district.

{63}     Section 22-5-4 does not alter or limit this relationship. To accept the School District's arguments on their face requires us to conclude that Section 22-1-2(H), defining the school board as "the policy-setting body" of the school district, is mere surplusage to 22-5-4 (A), in providing that among the "powers and duties" of a school board is, "subject to the rules of the department, [to] develop educational policies for the school district[.]" This interpretation violates a fundamental principle of statutory construction, that we are to give effect to all parts of statutes, particularly when they are enacted together. *See Albuquerque Cab Co.*, ___-NMSC-___, ¶ 9 ("We read related statutes in harmony and give effect to all provisions."); *Regents of Univ. of N.M.*, 1998-NMSC-020, ¶ 28 ("We will construe the entire statute as a whole so that

all the provisions will be considered in relation to one another."). Following this mandate, we give effect to both statutes, which we conclude are in fact complementary to each other.

{64} The public education department has what appears to be exclusive and plenary control over all education policies of the state. It was created pursuant to Article XII, Section 6 of the New Mexico Constitution. *See* NMSA 1978, Section 9-24-9 (2004). Among its far reaching statutory powers is the power to "determine policy for the operation of all public schools and vocational education programs in the state," to "supervise all schools and school officials coming under its jurisdiction," and to "prescribe courses of instruction to be taught in all public schools in the state, requirements for graduation and standards for all public schools[.]" Section 22-2-2(B), (C), (D). To achieve these ends, the secretary of education "shall have control, management and direction of all public schools, except as otherwise provided by law." Section 22-2-1. These statutes can be read as excluding a local school district from having *any* authority to enact educational policy for its own school district.

{65} However, the purposes of House Bill 212 are to have a "multicultural education system" that "integrates the cultural strengths of its diverse student population into the curriculum[,]" and "recognizes that cultural diversity in the state presents special challenges for policymakers, administrators, teachers and students" and to also

47

change public school governance "from the bottom up instead of from the top down," Section 22-1-1.2(B)(3), (4), and (F). In order to avoid any question and to be consistent with its purposes, House Bill 212 expressly and explicitly states that a local school board has the "powers or duties" to "develop educational policies for the school district" (that are "subject to the rules of the department") in Section 22-5-4(A). Granting a school board such authority is not a limitation, but an express recognition that each local board is a partner with the public education department in making education policy for that particular school district by taking into account the state's multicultural diversity to achieve student success. This authority is not unique to Section 22-5-4(A), as there are other additional express grants of policy-setting authority given to local school boards in the Public School Code. *See, e.g.*, Section 22-5-4.3(A) (directing that a local school board "shall establish student discipline policies"); Section 22-5-4.4(A) (stating that a school employee shall report student drug or alcohol abuse "pursuant to procedures established by the local school board"); Section 22-5-4.7(A) (providing that a school district shall establish a policy providing for the expulsion of a student who knowingly brings a weapon to a school); Section 22-5-6(A) (providing that a "local school board may waive the nepotism rule for family members of a local superintendent"); Section 22-10A-5(C) (requiring a local school board, together with a regional education cooperative, to "develop

48

policies and procedures to require background checks on an applicant who has been offered employment, a contractor or a contractor's employee with unsupervised access to students at a public school"). We therefore conclude that the powers and duties granted to school boards in Section 22-5-4(A) are in addition to, and not a limitation, on the general power to enact policy for the school district recognized in Section 22-1-2(H). "Statutes must be construed so that no part of the statute is rendered surplusage or superfluous." *Regents of Univ. of N.M.*, 1998-NMSC-020, ¶ 28 (internal quotation marks and citation omitted).

{66} We therefore reject the School District's additional assertion that the PELRB and district court erred in determining that the school board is the public employer under the PEBA and that when the school board signed the CBA, it did not have authority to do so. Under the PEBA, the "appropriate governing body" to engage in collective bargaining and enter into a CBA is "the policymaking . . . body representing the public employer" that at the local level is "the elected or appointed representative body . . . charged with management of the local public body." Section 10-7E-7. The school board is the policymaker here, and it satisfies the definition in all other respects. (Members of the school board are elected under Section 22-5-1.1).

{67} Summarizing, the PEBA provides that the locally elected body of the employer, which makes the employer's policies, is the proper party to engage in collective

49

bargaining with a labor organization which has the right to represent all the public employees of the bargaining unit in collective bargaining. Collective bargaining means negotiating for the purpose of "entering into a written agreement regarding wages, hours and other terms and conditions of employment[.]" Section 10-7E-4(F). The wages, hours, and other terms and conditions of employment between a public employer and its public employees without question implicate policies of the employer, and PEBA therefore dictates that the policymaker of the public employer is the proper party to engage in such negotiations and to enter into a CBA agreement. Here, the policymaker and employer is the school board, and it was the proper party to enter into the CBA with the Union.

{68} We note two more facts before concluding our discussion of this issue. By hearing an appeal at Step 4 of the grievance process, the school board is not making personnel decisions on an operational level. We agree, that as the chief executive officer of the school district, these are responsibilities of the superintendent. Moreover, by hearing an appeal at Step 4 of the grievance process, the school board is not "interfering" in personnel matters or "overruling" a personnel decision of the superintendent as suggested by the School District. These assertions overlook what a "grievance" is under the CBA. The CBA defines a "grievance" as "an allegation by an employee, group of employees, or the [Union], that there has been a violation,

50

misinterpretation, or misapplication of a specific provision of the [CBA]." Thus, at Step 4 of the grievance process, the CBA provides that the school board, as the policy maker who negotiated and agreed to the CBA, simply determines whether its own policy (i.e., a specific provision in the CBA) has been violated, misinterpreted, or misapplied. Making such a determination is not "interfering" in personnel matters nor does it constitute "overruling" a personnel decision of the superintendent. Instead, as the Union asserts, because the CBA applies to all employees, the school board is not involved in making a personnel decision on a personal basis, but under the contractual structure of the CBA through which all individual personnel matters are administered.

{69}     Finally, the School District's arguments completely overlook the fact that in addition to the president of the school board, the superintendent of the school district signed the CBA on behalf of the school district. While we have placed no weight on this fact in our analysis, even if we agreed with the School District's premise that the school superintendent has the exclusive power under the CBA to hear a grievance, by signing the CBA, the superintendent could be deemed to have delegated that authority to the school board.

**2.     Waiver of the Union's Right to Bargain for the Stipends**

{70}     The hearing officer found that the School District unilaterally added duties

51

and responsibilities to three hourly employees in the transportation department, designated them "transportation foreman" and changed their compensation by paying them a stipend of $4,000 per year. The additional duties and responsibilities were different from those usually performed by bargaining unit transportation employees, and would otherwise require overtime pay. Prior to these changes, the position of "[t]ransportation [f]oreman" did not exist. The Union became aware of the increased duties and pay and requested collective bargaining over the changes, but the School District refused. The hearing officer rejected the School District's argument that because it had previously paid stipends to other employees without negotiating them, the Union waived its right to bargain over these changes, and held that the School District violated the PEBA when it refused to bargain over the changes. The hearing officer did not, however, order rescission of the new duties and stipends because the Union did not request it, and because the CBA has in place a mechanism (discussed below) for ongoing discussions that are taking place under the CBA. The district court agreed and affirmed.

{71}    The School District states that its argument under this point "is primarily one of law, that is, whether the merger of two unions requires that the custom and practice of the employer and the surviving union continue to be recognized as a custom and practice, or whether the merger is a merger for some purposes but not for all."

52

However, the factual basis for this argument is not clearly presented to us by references to the transcript and record. *See* Rule 12-318(A)(3) NMRA (requiring briefs in chief to contain a summary of the facts that "shall contain citations to the record proper, transcript of proceedings, or exhibits supporting each factual representation"); *Muse v. Muse*, 2009-NMCA-003, ¶ 72, 145 N.M. 451, 200 P.3d 104 ("We will not search the record for facts, arguments, and rulings in order to support generalized arguments.").

{72}   From the briefs of the parties, we gather the following. The Union originally represented only certified academic employees who were paid a salary. Examples are teachers, psychologists, and nurses. The Union expanded the bargaining unit to include hourly paid maintenance and transportation employees, thereby merging two separate bargaining units into one.

{73}   Before the bargaining units were merged, when a school required additional services to be performed beyond the salaried position, such as running the science fair, sponsoring the chess club, or coaching cross-country, academic employees were paid stipends for the additional work. The School District would have us consider Exhibit 9 as evidence that "[t]here are, in fact over a thousand such stipends currently in effect." Exhibit 9 is a computer generated document consisting of twenty-four pages with numerous codes, but there is no evidence informing us how to understand

53

the exhibit or what the codes mean. We therefore do not consider Exhibit 9 further). The CBA at issue here is the first CBA in which negotiations for the combined unit had occurred, and during the negotiations, the duties and payment for a maintenance foreman stipend, and an asbestos inspector stipend, and an "on-call" stipend for employees that had just been merged into the unit were negotiated. The additional duties and stipends paid to academic employees before the "merger" had not been negotiated with the Union. The parties therefore also negotiated a memorandum of understanding as part of the present CBA to "examine the minimum requirements to be met for individuals to be eligible to receive their increment, stipend, or activity allowance" to be submitted to the superintendent and the Union for consideration and implementation.

{74}     From the foregoing factual summary, gleaned from the briefs, we infer that the School District's argument is that because of its past practice of giving salaried academic employees additional duties and pay in the form of a stipend without negotiating those changes, or an objection from the Union, the Union was bound by that practice with respect to the maintenance and transportation employees that were subsequently added to the bargaining unit. The School District contends that under federal law, which the PELRB looks to in interpreting the PEBA, the prior practice became part of the new CBA. In support of its argument, however, the School District

54

only refers us to cases that apply the concept of the "common law of the shop" to interpreting ambiguous phrases contained in a CBA. *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 581-582 (1960) (holding that the interpretation of contract terms in a CBA "is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally part of the collective bargaining agreement although not expressed in it"); *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1243 (10th Cir. 1998) ("It is well-established that when interpreting the terms of a labor contract, a fact-finder is entitled—and indeed, in some cases required—to look to the past practices of the parties and the 'common law of the shop' to determine the parties' contractual obligations." (footnote omitted)); *Champion Boxed Beef Co. v. Local No. 7*, 24 F.3d 86, 88-89 (10th Cir. 1994) ("It is a well-recognized principle that, except where expressly limited by a labor agreement, an arbitrator may consider and rely upon extrinsic evidence, including negotiating and contractual history of the parties, evidence of past practices, and the common law of the shop, when interpreting ambiguous provisions."). Because the School District neither claims nor presents any evidence of ambiguity in the CBA, these cases are inapplicable.

{75}     Further, we conclude that the evidence supports the finding of the hearing officer that the School District failed to prove that the Union waived its right to

55

bargain the transportation stipends. *See Ortiz v. Shaw*, 2008-NMCA-136, ¶ 19, 145 N.M. 58, 193 P.3d 605 ("Waiver is the intentional relinquishment of a known right." (internal quotation marks and citation omitted)); *Magnolia Mountain Ltd. P'ship v. Ski Rio Partners, Ltd.*, 2006-NMCA-027, ¶ 29, 139 N.M. 288, 131 P.3d 675 ("Waiver by acquiescence arises when a person knows he is entitled to enforce a right and neglects to do so for such a length of time that under the facts of the case the other party may fairly infer that he has waived or abandoned such right." (internal quotation marks and citation omitted)); *McCurry v. McCurry*, 1994-NMCA-047, ¶ 8, 117 N.M. 564, 874 P.2d 25 (holding that the party asserting waiver as a defense bears the burden to prove the waiver).

{76}     Finally, we agree with the observation made by the district court that it was not arbitrary or capricious for the PELRB to consider differences between paying salaried certified academic employees (white collar) for extracurricular activities such as sponsoring student clubs outside working hours and paying stipends to hourly paid maintenance and transportation employees (blue collar) for bargaining unit work that would otherwise require overtime, in concluding that the Union did not waive its right to bargaining over changes in duties and pay for the transportation employees.

**D.     RESULT**

{77}     Having reviewed the administrative record and the School District's arguments,

56

we conclude that the PELRB did not err, nor did the district court err in affirming the PELRB decision.

## V.   CONCLUSION

{78}   In the APS Appeal, the order of the district court issuing a permanent writ of mandamus to APS is affirmed.

{79}   In the School District Appeal, the memorandum opinion and order of the district court affirming the PELRB decision is affirmed.

{80}   **IT IS SO ORDERED.**


_____
**MICHAEL E. VIGIL, Judge**


**WE CONCUR:**


_____
**JONATHAN B. SUTIN, Judge**


_____
**JAMES J. WECHSLER, Judge Pro Tempore**