2006-NMSC-015

132 P.3d 587

**Cari I. AGUILERA, Plaintiff–Respondent,**

v.

**BOARD OF EDUCATION OF the HATCH VALLEY SCHOOLS, Defendant–Petitioner.**

No. 29,190.

Supreme Court of New Mexico.

March 14, 2006.

Corrected April 24, 2006.

Cuddy, Kennedy, Albetta & Ives, L.L.P., John F. Kennedy, Samantha J. Fenrow, Santa Fe, NM, for Amicus Curiae, New Mexico School Board Association, New Mexico Coalition of School Administrators.

Jones, Snead, Wertheim & Wentworth, P.A., Jerry Todd Wertheim, Santa Fe, NM, for Amicus Curiae, National Education Association of New Mexico.

Willie R. Brown, Santa Fe, NM, for Amicus Curiae, Public Education Department.

## OPINION

BOSSON, Chief Justice.

{1} Pursuant to a reduction in force (RIF) arising from a district-wide financial shortfall, Plaintiff Cari I. Aguilera, a certified arts teacher with the Hatch Valley Schools, was discharged during the term of her contract. Under the New Mexico School Personnel Act, a certified teacher may only be discharged for "just cause," NMSA 1978, § 22–10A–27(A) (2003), defined as "a reason that is rationally related to an employee's competence or turpitude or the proper performance of his duties," NMSA 1978, § 22–10A–2(F) (2003). Ms. Aguilera was not charged with any infractions relating to competence, turpitude or performance.

{2} An independent arbitrator reviewed the School Board's decision to discharge Ms. Aguilera and found there was no "just cause" under Section 22–10A–2(F). However, the arbitrator also found that the discharge was authorized by the district's RIF policy, and therefore upheld the discharge. The Court of Appeals reversed, holding for Plaintiff that "just cause" was limited to reasons based upon performance, competence, or turpitude, and did not include a RIF arising from fiscal problems in the school district. We granted certiorari to clarify the state statute defining "just cause" and what constitutes grounds for teacher termination or discharge. We affirm the result reached by the Court of Appeals, but for different reasons. Contrary to the Court of Appeals, we determine that the plain meaning interpretation of the "just cause" definition is not appropriate, but instead we look to judicial interpretations of

Castille & Ortiz, LLC, Robert D. Castille, Los Alamos, NM, for Petitioner.

Martin, Lutz, Roggow, Hosford & Eubanks, P.C., William L. Lutz, Las Cruces, NM, for Respondent.

"just cause" prior to the time the Legislature defined the term to inform our construction of the statute.

## BACKGROUND

{3} At the end of Ms. Aguilera's second year as a high school art teacher, the Board agreed to employ her as an art teacher for a third consecutive year at the middle school, and the parties entered into a contract. However, in early fall of that year, the Superintendent of Hatch Valley, Mr. Billy Henson, notified Ms. Aguilera that he would be recommending to the Board that she be discharged pursuant to a RIF. Allegedly, the RIF was necessary because of shortfalls in state funding and the discontinuation of certain federal grant money. Superintendent Henson made the decision to eliminate Ms. Aguilera's position because art was considered a non-vital academic area. Due to low enrollment, it would have the least effect on the students. The Board accepted the Superintendent's RIF plan, along with his recommendation to discharge Ms. Aguilera in the middle of her contract.

{4} Ms. Aguilera requested a hearing, and the Board upheld its decision. Ms. Aguilera appealed to an independent arbitrator who conducted a *de novo* review of the Board's decision. *See* NMSA 1978, § 22–10A–28(D) (2003). After a hearing, the arbitrator found that Ms. Aguilera had an excellent work history with Hatch Valley, and was losing her job as a result of the school district failing "to get its financial house in order." The arbitrator noted that Ms. Aguilera never "had any negative reports in terms of job performance, competence or suggestion of moral turpitude, or ever failed to properly perform [her] duties while employed by the Hatch Valley Public School System." The arbitrator also noted there was evidence that Hatch Valley could have finished the year with sufficient funds to pay Ms. Aguilera's salary. The arbitrator concluded, however, that Hatch Valley's RIF policy constituted "just cause" for the discharge of certified school personnel and termination of tenured employees.[1]

{5} Ms. Aguilera appealed the arbitrator's decision to the Court of Appeals which disagreed with the arbitrator's interpretation of state law, and held that the RIF policy did not constitute "just cause" under the School Personnel Act. *Aguilera v. Bd. of Educ.*, 2005–NMCA–069, ¶¶ 21, 23, 137 N.M. 642, 114 P.3d 322. The Court of Appeals determined that a plain reading of the definition of "just cause" and the requirement that a discharge "only" be for "just cause," meant that Ms. Aguilera could only be discharged for reasons personal to her qualifications and performance, and not for a RIF. *Id.* ¶ 13; *see* § 22–10A–27(A).

## DISCUSSION

■ {6} The issue in this case is whether statutory "just cause" allows for discharge of a teacher when exigent fiscal circumstances justify a RIF, but the teacher's competence, turpitude and performance do not. Because we are interpreting the School Personnel Act, and its application to this case, we apply a *de novo* standard of review. *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806; *Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005–NMCA–022, ¶ 16, 137 N.M. 26, 106 P.3d 1273.

{7} The term "just cause" was not defined by statute until the Legislature amended the Act in 1991. *See* 1991 N.M. Laws ch. 187, § 3. However, prior to the 1991 amendment, New Mexico courts had interpreted the meaning of "just cause" or comparable terms for almost half a century. To put the 1991 amendment in proper context, we look first to the history of our case law interpreting the predecessor statutes of the School Personnel Act, commonly known as teacher's tenure statutes. We consider whether the Legislature, in adding a "just cause" definition in 1991, intended to codify that case law and its history or reject it in favor of a new, more limited concept of "just cause." Finally, we examine specifically whether a RIF can be "just cause" for discharge under the Act, and if so, whether "just cause" was proven to discharge Ms. Aguilera.

---

1. The same definition of "just cause" in Section 22–10A–2(F), applies to both the discharge of certified school employees, see § 22–10A–27(A), and to the termination of tenured employees, see NMSA 1978, § 22–10A–24(D) (2003).

### The History of the Teacher's Tenure Statute and the *Swisher* Rule

{8} Long before any statutory directive, this Court acknowledged over 80 years ago that a school board had the implicit right to terminate a teacher for "adequate cause," a right derived from its statutory power to employ that same teacher. *Tadlock v. Sch. Dist. No. 29 of Guadalupe County*, 27 N.M. 250, 256, 199 P. 1007, 1009 (1921); *accord Landers v. Bd. of Educ.*, 45 N.M. 446, 452–53, 116 P.2d 690, 693–94 (1941) (stating that a discharge cannot be without cause). Subsequently, in line with this Court's decisions, the Legislature amended the 1925 version of the Act, to say that no teacher could be discharged "except upon good cause." 1941 N.M. Laws, ch. 202, § 3; *see also Ortega v. Otero*, 48 N.M. 588, 592, 154 P.2d 252, 254–55 (1944). The Legislature did not define "good cause."

{9} Interpreting the public policy animating the 1941 amendment, we stated:

> The effect of the amendment is to further protect the employment status of teachers.
>
> Of greater significance, however, is the time and circumstance of the amendment.
>
> The Legislature of 1941 doubtless sensed the need to get in step with the march of progress toward a greater security to those who have become equipped through education and training to assume positions in our school system.
>
> What is known as Teachers' Tenure Acts have been adopted in most of the states of our union, the objects of which are to encourage men and women to make a lifetime profession of teaching and to stimulate them to seek positions in the school system requiring the qualifications of teachers, and to protect them in their employment from the whims of those possibly politically minded, and to insure their continuance in such employment.

*Ortega*, 48 N.M. at 593, 154 P.2d at 255; *see also Stapleton v. Huff*, 50 N.M. 208, 211, 173 P.2d 612, 613 (1946). In light of the legislative policy to protect teachers as professionals, this Court determined that "good cause" meant reasons related to satisfactory performance of duties. *Stapleton*, 50 N.M. at

211, 173 P.2d at 613; *see also Atencio v. Bd. of Educ.*, 99 N.M. 168, 170, 655 P.2d 1012, 1014 (1982) ("By statute [teachers] are assured an indefinite tenure of position during satisfactory performance of their duties.").

{10} It is from this statutory and jurisprudential genesis that this Court created the basis to analyze a discharge or termination of a teacher when the reason for severing the teacher's employment is not personal, but rather based on some exigent circumstance. In the *Swisher* case in 1955 this Court noted that "[a]bsent grounds personal to the teacher," the standard to be applied in a discharge resulting from a RIF required the Board "to show affirmatively that there was no position available [that the teacher] was qualified to teach." *Swisher v. Darden*, 59 N.M. 511, 516, 287 P.2d 73, 76 (1955), *superseded by statute on other grounds as stated in Sanchez v. Bd. of Educ.*, 80 N.M. 286, 454 P.2d 768 (1969). *Swisher* arose from the aftermath of racial desegregation in the Las Cruces school system. 59 N.M. at 513, 287 P.2d at 74. The local school board closed the segregated, blacks-only high school where Ms. Swisher taught because most of the students had been integrated into mixed-race schools. *Id.* The local board discharged Ms. Swisher, despite her tenure, because it concluded that her services could no longer be utilized within an integrated school system. *Id.*

{11} On appeal, the State Board of Education found no "just cause" for the termination, pointing out that none of the personal grounds under the law—immorality, insubordination, incompetency, or disloyalty to the United States—were present. *Id.* at 514, 287 P.2d at 75. On review, the district court upheld the State Board, and noted further that the local board chose not to retain Swisher because it believed that, as a black teacher, she would be unable to teach in a white or mixed-race school. *Id.* at 516, 287 P.2d at 77. On appeal to this Court, the local board argued that it had demonstrated sufficient cause because it made its decision in good faith and not for pretextual reasons. *Id.* at 516, 287 P.2d at 76. In our opinion, we agreed that under a "just cause" standard a teacher could be terminated for more than

just personal reasons, but if so, then "more was required" of the school board to justify its decision. *Id.* We stated: "Admittedly, the [school where Swisher taught] was closed for economic reasons. But more was required. Absent grounds personal to the teacher, to terminate her services it was necessary to show affirmatively that there was no position available which she was qualified to teach." *Id.* A mere statement of systemic shrinkage due to desegregation was not enough.

{12} *Swisher* remains today the seminal case on a school board's power to terminate a tenured teacher absent personal grounds. *See Penasco Indep. Sch. Dist. No. 4 v. Lucero,* 86 N.M. 683, 684, 526 P.2d 825, 826 (Ct.App.1974) ("The controlling rule on the local board's power to terminate a tenure teacher was stated in *Swisher.* ..."). *Swisher* has been applied specifically to RIF situations, albeit with differing results. *See N.M. State Bd. of Educ. v. Abeyta,* 107 N.M. 1, 2, 751 P.2d 685, 686 (1988); *see also Hensley v. State Bd. of Educ.,* 71 N.M. 182, 185, 376 P.2d 968, 970 (1962) ("[A] reduction in the teaching staff, without more, would not appear to be a good and sufficient reason for the dismissal of a tenure teacher when other teachers without tenure are retained in her place and stead.").

{13} In *Fort Sumner Municipal School Board v. Parsons,* 82 N.M. 610, 612–14, 485 P.2d 366, 368–70 (Ct.App.1971), the school board was forced to conduct a RIF, and it decided to retain two non-tenured teachers instead of reemploying Parsons, a tenured teacher. The Court of Appeals held the *Swisher* requirement was met because, in a small school system, it was imperative to retain the two non-tenured teachers who could teach the same subjects as Parsons as well as other subjects that Parsons could not. *Parsons,* 82 N.M. at 613, 485 P.2d at 369. Therefore, it was necessary to retain these two teachers instead of Parsons to prevent the overall academic program at the school

from being seriously compromised. *Id.* at 613–14, 485 P.2d at 369–70.

{14} Following *Parsons,* this Court was faced with a similar situation in *Abeyta,* 107 N.M. at 2, 751 P.2d at 686, where, because of a RIF, the school board had three tenured social studies teachers, but only two positions available. Based on a performance evaluation, Abeyta was identified for termination. *Id.* The board considered realignment, a rearranging of staff to different positions, but rejected it because realignment would detrimentally affect other academic areas at the school. *Id.* Based on this record, we held that the board had satisfied the *Swisher* requirement. *Id.* at 3, 751 P.2d at 687. Before resorting to termination, it had considered reasonable alternatives for which Abeyta was qualified and rejected them based on reasons solidly grounded in the academic welfare of the school. *Id.* at 2–3, 751 P.2d at 686–87.

{15} *Abeyta* and *Parsons* inform us that the *Swisher* rule is to be applied in the context of whatever special facts and circumstances pertain to each individual case. Pursuant to *Swisher,* a school board faced with a RIF must strive to find another eligible position for which the teacher is qualified. However, the school board is not required to imperil the quality of education, or conduct a realignment that is proven to have a deleterious effect on the overall academic program of the school system. *Abeyta* and *Parsons* represent the law in effect in 1991, before our Legislature, for the first time, enacted its own definition of "just cause."

### Effect of the 1991 Amendment to the School Personnel Act

{16} The 1991 amendment to the School Personnel Act defined "just cause" as "a reason that is rationally related to an employee's competence or turpitude or the proper performance of his duties." Section 22–10A–2(F).[2] Given *Swisher's* dominant po-

---

**2.** We note this case involves only the discharge of a certified teacher, and not termination. "[D]ischarge" is defined as "the act of severing the employment relationship with a certified school employee prior to the expiration of the current employment contract." Section 22–10A–2(A).

"[T]ermina[tion]" is "the act of not reemploying an employee for the ensuing school year." Section 22–10A–2(D). In all cases of discharge, the teacher may only lose her position for "just cause." Section 22–10A–27(A). In termination cases, if the teacher is tenured, the teacher may

sition at that time in our case law, the question is whether the 1991 amendment defining "just cause" was intended to codify *Swisher* or to overturn it. The Court of Appeals strictly interpreted the language of the "just cause" definition to reach its conclusion. We believe, however, that the Legislature intended to incorporate this Court's case law when it defined "just cause."

{17} At first glance, the "just cause" definition might appear to give no room for the balance struck in *Swisher*, because it limits the grounds for discharge and termination to reasons rationally related to competence, turpitude, or proper performance of duties. *See* § 22–10A–2(F). Indeed, this is how Ms. Aguilera argues her case—that reasons external to teacher performance, such as a RIF, can never be grounds for termination. On the other hand, the Board argues that a properly justified RIF will always constitute "just cause," and nothing more need be shown. Notably, neither view allows for any compromise in the middle, much as this Court crafted in *Swisher* years ago.

{18} We believe both positions are extreme, and neither captures the essence of legislative intent. We look to the amendment to determine if the middle ground struck in *Swisher* survives. Put another way, we look for any indication that the Legislature intended such a radical change that would eliminate its essential compromise. We first determine the intent of the Legislature in deciding to define "just cause" for the first time, and then interpret the language of the definition itself based on that legislative intent.

{19} The primary goal of statutory construction is to give effect to the intent of the Legislature. *State v. Young*, 2004–NMSC–015, ¶ 5, 135 N.M. 458, 90 P.3d 477. Normally, when the Legislature amends a statute, we presume it intends to change existing law. *Wasko v. N.M. Dep't of Labor*, 118 N.M. 82, 84, 879 P.2d 83, 85 (1994).

However, "an amendment may clarify existing law, rather than change the law, if the statute was ambiguous or unclear prior to the amendment." *Wasko*, 118 N.M. at 85, 879 P.2d at 86; *accord Resolution Trust Corp. v. Binford*, 114 N.M. 560, 568, 844 P.2d 810, 818 (1992); *See generally* 1A NORMAN J. SINGER, STATUTES & STATUTORY CONSTRUCTION § 22:1, at 239, 241–42; § 22.30, at 357, 357–76 (6th ed.2002 revision). The Legislature may also amend a statute to adopt prior interpretations by the courts. *See* 2B SINGER, *supra*, § 50:02, at 144, 144–50; *State v. Ortega*, 112 N.M. 554, 579, 817 P.2d 1196, 1221 (1991) (Baca, J., concurring in part and dissenting in part) (arguing the Legislature amended felony murder statute to adopt the judicial interpretation given the prior act); 1A SINGER, *supra*, § 22:31, at 380.

{20} The 1991 amendment did not alter any terms of the School Personnel Act dealing with grounds for discharge, or make substantive changes; it simply added a definition. Such a modest step is not usually a harbinger of radical change. *See State v. Morrison*, 1999–NMCA–041, ¶¶ 11–13, 127 N.M. 63, 976 P.2d 1015; *cf. Blackwood & Nichols Co. v. N.M. Taxation & Revenue Dep't*, 1998–NMCA–113, ¶ 15, 125 N.M. 576, 964 P.2d 137 (holding that substantial revision of statute materially changed existing law, rather than clarifying it). Normally, the Legislature will signal its intent to effect a substantial change in the law, and it did not do so in this instance. The 1991 amendment, adding only the "just cause" definition, appears more like a supplementary act rather than an amendatory act, as it simply "adds to, or completes, or extends that which is already in existence without changing or modifying the original." 1A SINGER, *supra*, § 22:24, at 330–31 (quoting *McCleary v. Babcock*, 169 Ind. 228, 82 N.E. 453, 455 (1907)).

{21} The statutory evolution of the "just cause" requirement for discharge and termination supports our conclusion that no substantive change in the law was intended.

---

not be fired except for "just cause." Section 22–10A–24(D). A teacher obtains tenure by remaining employed by "a school district or state agency for three consecutive years." *Id.* A non-tenured teacher may be terminated for any reason deemed sufficient by the school board. Section

22–10A–24(A). "Just cause," as defined in Section 22–10A–2(F), applies to both discharge of any teacher and termination of a tenured teacher. Our decision regarding when an RIF is "just cause" to discharge a teacher, is equally applicable to termination of a tenured teacher.

Since it first required "good cause," *see* 1941 N.M. Laws, ch. 202, § 3, the Legislature has consistently required a showing of "good" or "just cause" for discharge. In the original codification of the 1978 statutes, the current version we follow, the Legislature required "good and just cause" for both discharge and termination. *See* 1978 Comp., § 22–10–17 (discharge), as enacted by 1967 N.M. Laws, ch. 16, § 119 (recompiled as 1978 Comp., § 22–10A–27 by 2003 N.M. Laws, ch. 153, § 72); 1978 Comp., § 22–10–14 (termination), as enacted by 1967 N.M. Laws, ch. 16, § 116 (recompiled as 1978 Comp., § 22–10A–24 by 2003 N.M. Laws, ch. 153, § 72). In 1986, the Legislature changed the standard for termination of tenured employees, prohibiting only those terminations that were "based upon grounds that are arbitrary or capricious or legally impermissible." 1986 N.M. Laws, ch. 33, § 22. However, in the same amendment, the Legislature left intact the "good and just cause" requirement for discharge. 1986 N.M. Laws, ch. 33, § 24. Finally, in 1991, the Legislature restored the "just cause" requirement for termination and made only slight changes to the discharge statute by removing "good and" from "good and just cause," in addition to defining "just cause." *See* 1991 N.M. Laws, ch. 187, §§ 3, 4, 7.

{22} Thus, it seems clear that the 1991 amendment was aimed at restoring "just cause" as a condition to termination, thereby restoring to tenured teachers the protections they had enjoyed before 1986. It is equally clear that the Legislature made no substantive changes to the discharge statute, leaving intact the protections tenured teachers had enjoyed for decades. We discern no legislative intent from this textual history to effect the kind of radical change now suggested by Plaintiff: an intent to create a kind of "super-tenure," strictly limiting the grounds for either termination or discharge to personal factors and making teachers entirely immune from the economic consequences of a valid RIF. If that is the legislative intent, we await a clearer manifestation from the legislative branch.

{23} We also observe that any plain meaning analysis of the amendment could lead to harsh, even absurd results. *See State ex rel. Helman v. Gallegos,* 117 N.M. 346, 351–52, 871 P.2d 1352, 1357–58 (1994) (holding that courts may look beyond the plain language of a statute where it would lead to absurd or unreasonable results); *Santa Fe County Bd. of County Comm'rs v. Town of Edgewood,* 2004–NMCA–111, ¶ 5, 136 N.M. 301, 97 P.3d 633. It would mean that a school board could never discharge or terminate a teacher even when compelled by economic reasons to reduce its teacher force. Absent a clear-cut legislative directive, we will not assume the Legislature intended to leave a school board powerless to respond to financial crisis.

{24} Instead of being forced to choose between two all-or-nothing positions, we believe the Legislature intended a more moderate view. It did not intend to tie the hands of a school board faced with the necessity of a RIF, but neither did the Legislature intend to place tenure teachers at the mercy of school administrators. We presume the 1991 legislature was aware of existing law, including the case law of our appellate courts. *State v. Cleve,* 1999–NMSC–017, ¶ 14, 127 N.M. 240, 980 P.2d 23 (stating that the Legislature is presumed to know existing law when enacting a statute). In the absence of a clear legislative directive to abandon existing law, we continue to apply it. Existing law includes the balance struck in *Swisher* and its progeny between the competing demands of tenure protection and administrative exigency.

{25} *Swisher* recognizes the limited circumstance when a board is forced to discharge or terminate a competent teacher for reasons external to the personal context. When we view "just cause" in light of the legislative intent to protect both teachers and school systems, and our precedent dating back over half a century, we conclude that the 1991 statutory definition intended to codify and incorporate the *Swisher* rule into the School Personnel Act. Accordingly, we hold that when a school board is forced to reduce its teaching staff by way of a RIF, it must satisfy the *Swisher* requirement and prove that there is no other position for which the teacher is *qualified* consistent with the academic necessities of the district. This rule

gives considerable protection to teachers and tenured employees, while still allowing a school board to conduct a RIF when faced with compelling circumstances.

## The *Swisher* Rule was not Properly Applied in this Case

{26} Because we hold that the *Swisher* rule applies to this case, we must now determine if the Hatch Valley School Board satisfied it. Unfortunately for the Board, we find nothing in the record to indicate the Board even considered the rule, much less satisfied it. We also determine that in his *de novo* review, the arbitrator applied the wrong standard, one that was inconsistent with *Swisher*.

{27} The School Board's written decision makes no mention of any consideration by the Board of *Swisher*-type alternatives, and no evidence was presented to the Board to this effect. The Board's minutes of the meeting when it was suggested that a RIF was needed, show that Superintendent Henson informed the Board that attempts had already been made to reduce the work force through attrition, and he had considered cutting some extra-curricular activities. However, Superintendent Henson suggested that "extra-curricular activities not be eliminated at this time because of the large numbers of students . . . involved," and their importance to student success. Interestingly, the Superintendent also testified that of the 70 teachers in the Hatch Valley system, six are football coaches, and just that year, the number was increased from five to six. While these broad-based "alternatives" may be valid considerations to determine where to apply the RIF, they do not address the individually based requirement of *Swisher* once a teacher is identified for discharge. They do not discuss particular alternatives for Ms. Aguilera and her particular qualifications. Similarly, the minutes of the September 30, 2002, meeting in which the Board actually approved the elimination of the middle school art program, reflect no determinations about whether there were other qualified positions for the only teacher in that program, Ms. Aguilera.

{28} Under *Swisher*, it is the Board's burden and duty to make the proper deter-

mination that no other positions exist. The record is devoid of any evidence that this occurred. In his memorandum to the Board, purporting to lay out the RIF plan, Superintendent Henson indicated that substandard licensed personnel are the first people to be discharged. The arbitrator concluded this statement referred to Ms. Aguilera, as she had a substandard license. However, Superintendent Henson's plan to the Board never identified Ms. Aguilera as having a substandard license, and never indicated to the Board the significance of the statement. This information should have been presented to the Board to satisfy *Swisher*, as it had the ultimate authority to discharge Ms. Aguilera.

{29} Because the Board never considered the *Swisher* standard or any evidence that Superintendent Henson applied *Swisher*, we hold the Board's decision was invalid. However, because the arbitrator conducted a *de novo* review, we must also determine if *Swisher* was properly applied in that proceeding. We hold it was not.

{30} In the findings of fact and conclusions of law, the arbitrator found the RIF policy constituted "just cause" for discharge or termination. The only limiting principle was that the RIF "must be exercised by the board in good faith and based on bonafide educational considerations, and not as a subterfuge for discharging . . . without good or just cause or for any other impermissible reason." This surely does not satisfy *Swisher*. This Court expressly rejected the same argument of good faith when advanced by the Las Cruces Board in its attempt to terminate Ms. Swisher. *See Swisher*, 59 N.M. at 516, 287 P.2d at 76.

{31} The arbitrator also noted the RIF plan requires "a discussion of alternatives considered by the superintendent with an explanation as to why such alternatives were rejected." This requirement is much broader than the *Swisher* rule and focuses on school programs rather than individual affected teachers. Counsel for the Board, during closing statements argued for a more relaxed standard, stating:

The manner in which a company chooses to conduct a RIF is within its sound business discretion. And plaintiffs in this case, having failed to introduce any evidence that the RIF criteria or pretext for discriminatory motives.... [T]here is nothing that suggests that Mr. Henson ... targeted [Plaintiff] for the loss of [her job] for either impermissible discriminatory kinds of reasons....

*Swisher* and *Abeyta* were mentioned by both counsel, but only in a vague fashion without ever really focusing on the specific requirement of *Swisher* that was applied to a RIF in *Abeyta*.[3]

{32} Unlike termination, which applies to the coming year, discharge results in a teacher losing her job in the middle of the school year, when there may be no opportunity to find other employment. Given the extreme hardship to the teacher, the justifications must be substantial to allow a school board to layoff qualified teachers in the middle of a school year pursuant to a RIF. The school board has to show not just projected financial burdens in the future, but that it cannot survive financially for the present year, which is already underway. To avoid such draconian consequences, the Legislature has authorized a school district to reserve up to 5 percent of its cash balance for an emergency fund to help get through the year when it experiences "unforeseen expenditures incurred after the annual budget was approved." NMSA 1978, § 22–8–41(B) (2004).

## CONCLUSION

{33} We conclude that the Board failed to make the requisite showing under *Swisher*, both in its decision and before the arbitrator, and therefore failed to prove "just cause" for the discharge of Ms. Aguilera. Accordingly, we affirm the result reached by the Court of Appeals, reverse the arbitrator's decision and remand for whatever further proceedings are necessary to implement this Opinion.

{34} **IT IS SO ORDERED.**

WE CONCUR: PAMELA B. MINZNER, PATRICIO M. SERNA, PETRA JIMENEZ MAES, and EDWARD L. CHÁVEZ, Justices.

---

**3.** There was evidence before the arbitrator similar in nature to that required by *Swisher*. Superintendent Henson testified about the nature of Ms. Aguilera's substandard license as compared to the high school art teacher's, and he also claimed to have considered a realignment. Theoretically, this evidence might have satisfied the *Swisher* requirement that the school consider other alternatives for which the teacher is qualified. However, nothing in the record indicates the arbitrator considered this evidence in light of *Swisher* or followed *Swisher*.