The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: June 3, 2026

**No. A-1-CA-42489**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**MOHAMMED KAHLA,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Joseph A. Montaño, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Walter Hart, Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Mark A. Peralta-Silva, Assistant Appellate Defender
Albuquerque, NM

for Appellant

**OPINION**

**HANISEE, Judge.**

{1}    Defendant Mohammed Kahla was convicted by a jury of one count each of the following crimes: battery, contrary to NMSA 1978, Section 30-3-4 (1963); shooting at or from a motor vehicle with a firearm enhancement, contrary to NMSA 1978, Sections 30-3-8(B) (1993) and 31-18-16(C) (2022); and conspiracy to commit tampering with evidence, contrary to NMSA 1978, Sections 30-22-5 (2003) and 30-28-2 (1979). Defendant raises five arguments on appeal, relating to multiple evidentiary challenges, double jeopardy, vindictive prosecution, and sufficiency of the evidence. We affirm.

**BACKGROUND**

{2}    In the early hours of January 9, 2023, Defendant arrived for his shift at the Adam Food Market (the Market), a local grocery store in Albuquerque, New Mexico. Before going in, Defendant and his coworker, Audrey Sullivan, were sitting in his car—parked directly in front of and facing the Market—when Joshua Apodaca (Victim) pulled into the adjacent parking spot. Soon thereafter, as Ms. Sullivan stood adjacent to Defendant's passenger side door, Victim exited his car and began to urinate between both vehicles, nearer toward the rear bumper of his own car, but in very close proximity to Defendant's rear bumper and Ms. Sullivan. Infuriated, as visibly depicted in high quality video of the events from the Market's security

cameras, Defendant confronted Victim, who soon got back into his own car. After several minutes, during which Defendant was yelling at Victim and lunging at him through the window, Victim abruptly backed from the parking space, but then reverses course and pulled forward toward Defendant's car, inching toward Defendant's rear bumper. Defendant, by then armed and brandishing a handgun, fired the first of eight shots toward the lower portion of Victim's vehicle as it made contact with Defendant's car, at which point Victim again reverses his vehicle and backs away from Defendant's car and toward the street, seemingly to leave the parking lot. Defendant then fired upon Victim's car seven more times. With Victim still inside his car at the edge of the parking lot close to the street, Defendant and others on the scene are seen speaking to one another, after which some of those on the scene began to retrieve spent bullet casings from the ground near where the shots were fired. Eventually, some of the casings were provided to Defendant, who is seen in camera footage depositing something into a trash can outside the Market.

{3}     Defendant was initially indicted for two crimes: shooting at or from a motor vehicle, and negligent use of a deadly weapon. Shortly thereafter, due to a conflict, the district attorney's office recused itself from the case, which was then prosecuted by the New Mexico Department of Justice (NMDOJ).[1] The NMDOJ chose to pursue

---

[1] Renamed the New Mexico Department of Justice since the underlying litigation, we refer to the former New Mexico Attorney General's Office by its present name.

additional charges against Defendant, leading to a superseding indictment charging Defendant with single counts of battery, tampering with evidence, conspiracy to commit tampering with evidence, criminal solicitation to commit tampering with evidence, and two counts of aggravated assault with a deadly weapon and shooting at or from a motor vehicle.

{4}	Before trial, the NMDOJ moved to dismiss the two counts of aggravated assault with a deadly weapon due to Victim's testimony being suppressed. As to the remaining counts, the jury hung as to the one count of shooting at or from a motor vehicle and the one count of tampering with evidence. Defendant was convicted of the single counts of battery, shooting at or from a motor vehicle with a firearm enhancement, and conspiracy to commit tampering with evidence. This appeal followed.

**DISCUSSION**

**I.	Double Jeopardy**

{5}	Defendant argues that imposition of the firearm enhancement, applicable to noncapital felonies committed with a firearm, violates double jeopardy given the same act warranting the sentencing enhancement is also a necessary element of the crime of shooting at or from a motor vehicle. Defendant asserts that the legislative policy behind the firearm enhancement statute was not intended to apply to the crime of shooting at or from a motor vehicle. He claims that factual differences distinguish

this case from the rationale expressed by our New Mexico Supreme Court in *State v. Baroz*, 2017-NMSC-030, ¶ 27, 404 P.3d 769 (holding in pertinent part that the firearm enhancement did not violate double jeopardy because it was broadly intended by the Legislature to authorize greater punishment for noncapital felonies committed with a firearm).

{6}     We apply a de novo standard of review to a double jeopardy claim. *State v. Cummings*, 2018-NMCA-055, ¶ 6, 425 P.3d 745. "Among its protections, the double jeopardy clause protects a defendant against multiple punishments for the same offense." *State v. Gonzales*, 2007-NMSC-059. ¶¶ 10-11, 143 N.M. 25, 172 P.3d 162. Defendant raises such a "double description" claim, claiming he was convicted of more than one offense under different statutes for a single act or course of conduct. *See State v. Vigil*, 2021-NMCA-024, ¶ 17, 489 P.3d 974 ("There are two types of multiple punishment cases: (1) a unit[ ]of[ ]prosecution claim, where an individual is convicted for multiple violations under the same statute for a single course of conduct; and (2) a double[ ]description claim, where an individual is convicted for violating different statutes for a single course of conduct.").

{7}     We address double jeopardy claims involving double description under the two-part analysis set forth in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223, which requires us to first consider whether the conduct underlying the two convictions was unitary. *Id*. Only if the conduct is unitary do we proceed to

the second step. *See State v. Carrasco*, 1997-NMSC-047, ¶¶ 22-23, 124 N.M. 64, 946 P.2d 1075. There is no dispute between the parties that Defendant's conduct—using a gun to fire eight bullets in close proximity to one another at Victim's car—was unitary, prompting us to proceed directly with the second, dispositive part of our analysis: "whether the [L]egislature intended to create separately punishable offenses," *Swafford*, 1991-NMSC-043, ¶ 25, based on the same conduct. *See id.* ¶ 28 ("If it reasonably can be said that the conduct is unitary, then one must move to the second part of the inquiry.").

{8}     Defendant's request hinges upon his argument that the reasoning in *Baroz* is inapplicable to this case. We conclude instead that while factually distinct in certain respects, our Supreme Court's stated rationale in *Baroz* indeed governs the legality of Defendant's firearm enhancement, despite its application here to the crime of shooting at or from a motor vehicle, and not aggravated assault with a deadly weapon. We explain.[2]

---

[2]We have previously held in a memorandum opinion that "the reasoning of *Baroz* applies to [the d]efendant's sentence for shooting at or from a motor vehicle." In so holding, this Court reversed a sentence imposed by the district court that failed to apply the firearm enhancement to the defendant's sentence. *See State v. Young*, A-1-CA-40649, mem. op. (N.M. Ct. App. May 15, 2023) (nonprecedential). Our Supreme Court initially granted, then quashed the petition for writ of certiorari in *Young. See Young*, A-1-CA-40649, mem. op., *cert granted*, 2023-NMCERT-007, *cert. quashed*, 2025-NMCERT-003. We now write to formalize our holding in *Young*.

{9} In *Baroz*, 2017-NMSC-030, our Supreme Court addressed the issue of whether a firearm enhancement violates double jeopardy in the context of a noncapital felony involving a firearm. In that case, the defendant's sentences for two counts of aggravated assault with a deadly weapon were enhanced, pursuant to Section 31-18-16(A). However, *Baroz* did not dissect legislative intent underpinning the aggravated assault statute; rather, it looked to the firearm enhancement statute itself:

> Section 31-18-16(A) provides that a sentence shall be increased by one year when a court or jury makes a separate finding of fact that a firearm was used in the commission of a noncapital felony. Section 31-18-16(A) thereby authorizes multiple punishments for the commission of a noncapital felony with a firearm.

*Baroz*, 2017-NMSC-030, ¶ 25. Ultimately, the Court concluded the enhancement to be validly imposed despite the fact that the use of a firearm was a necessary element of the crime, as proven by the state at trial. *Id.* ¶ 27.

{10} We model our analysis accordingly, as applicable to this case. Here, Defendant was convicted of shooting at or from a motor vehicle, which is by definition a noncapital felony. *See* NMSA 1978, § 30-1-7 (1963) ("A felony is a capital, first, second, third or fourth degree felony when it is so designated under the Criminal Code. A crime declared to be a felony, without specification of degree, is a felony of the fourth degree."); *see also* § 30-3-8(B) ("Whoever commits shooting

at or from a motor vehicle that does not result in great bodily harm to another person is guilty of a fourth degree felony.").

{11} Defendant argues that the Legislature "has not explicitly provided for multiple punishments" in this specific context because in recent amendments the Legislature did not add language to "specifically allow multiple punishments for *all* noncapital felonies." We believe further explanatory legislation to be unnecessary, and view the plain language of Section 31-18-16(A) to clearly state the Legislature's intention to impose multiple punishments for the array of noncapital offenses committed with a firearm.

{12} Generally, in our review of statutory amendments, we assume "that the Legislature is well informed and aware of existing statutory and common law." *State v. Thompson*, 2022-NMSC-023, ¶ 18, 521 P.3d 64. Consequently then, when faced with an ambiguous statutory amendment and longstanding judicial interpretation of the provision, we conclude that the Legislature did not intend to opaquely limit a law that has long been broadly applied, as it has been here. We must presume that the Legislature will use "clear and unequivocal terms" to signify its intent to change existing law. *See State v. Morrison*, 1999-NMCA-041, ¶¶ 11-13, 127 N.M. 63, 976 P.2d 1015 (explaining that changes to tense and punctuation showed intent to clarify, not materially alter the law); *see also Aguilera v. Bd. of Educ. of Hatch Valley Schs.*, 2006-NMSC-015, ¶ 24, 139 N.M. 330, 132 P.3d 587 ("In the absence of a clear

legislative directive to abandon existing law, we continue to apply it."); *cf. Blackwood & Nichols Co. v. N.M. Tax'n & Revenue Dep't*, 1998-NMCA-113, ¶ 15, 125 N.M. 576, 964 P.2d 137 (holding that the deletion of a provision and rewriting of other provisions materially changed the law). Here, the Legislature made no change limiting application of the firearm enhancement.

{13}     *Baroz* also supports our interpretation, stating plainly that "[t]he very nature of a firearm enhancement is to require the sentencing judge to increase or enhance the basic sentence that applies to the crime. By enacting the enhancement, the Legislature intended to authorize greater punishment for noncapital felonies committed with a firearm." *Baroz*, 2017-NMSC-030, ¶ 27. The question of whether a firearm enhancement violates double jeopardy in the context of a noncapital felony having been squarely addressed by our Supreme Court, we must only consider whether the reasoning stated in *Baroz* in the context of the defendant's conviction of aggravated assault with a firearm applies equally to Defendant's sentence for shooting at or from a motor vehicle. It does; indeed, the word "shooting" in the title of the instant crime is virtually all that distinguishes *Baroz* from this case, and is an insufficient basis to reach a different conclusion. Rather, to do so would serve to ourselves constrain a New Mexico Supreme Court decision on a basis unmentioned therein on minimally different facts.

{14} Thus, while Defendant urges this Court to interpret the holding in *Baroz* to apply to some but not all noncapital felonies, we are not at liberty to overrule precedents of our Supreme Court. *See State ex rel. Martinez v. City of Las Vegas*, 2004-NMSC-009, ¶ 22, 135 N.M. 375, 89 P.3d 47 ("[T]he Court of Appeals is bound by Supreme Court precedent."). We conclude then that the firearm enhancement does not violate Defendant's right to be free from double jeopardy, we formalize our analysis in *Young*, and affirm the application of the enhancement to Defendant's sentence for shooting at or from a motor vehicle.

## II. Evidentiary Issues

### A. Standard of Review

{15} Generally, "[w]e review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of clear abuse." *State v. Hnulik*, 2018-NMCA-026, ¶ 6, 458 P.3d 475 (internal quotation marks and citation omitted). "We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citation omitted).

### B. Rule 11-404(B)

{16} Defendant argues that the district court erred in denying his request, under Rule 11-404(B), to introduce evidence of Victim's prior convictions. Defendant

asserts that Victim's prior crimes showed his violent nature and were probative of the danger posed to Defendant on the day of the incident. The district court denied Defendant's request, ruling that it did not meet one of the permissible uses under Rule 11-404(B) and consequently deemed it to be propensity evidence.

{17}    He further contends that evidence of Victim's prior convictions was relevant and tended to negate Defendant's guilt, and urges this Court to apply a "more lenient standard of admissibility" with this evidence. Defendant states that his argument hinges upon whether it was him or Victim who became the first aggressor and that Victim's prior convictions would have tended to show that Victim intended to harm Defendant, and Defendant was acting in self-defense as well as in defense of others. We are unpersuaded.

{18}    "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Rule 11-404(B)(1); *State v. Bailey*, 2017-NMSC-001, ¶ 13, 386 P.3d 1007. The other-act evidence may, however, be admissible for other purposes, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2); *Bailey*, 2017-NMSC-001, ¶ 13. But standing alone, the fact that a victim has prior criminal history does not establish any of these exceptions to general inadmissibility. And although admissibility under Rule 11-404(B) can be established by evidence of

specific instances of a victim's "prior violent conduct of which the defendant *was aware . . .* to show the defendant's fear of the victim," such was not the case here. *See State v. Armendariz*, 2006-NMSC-036, ¶ 17, 140 N.M. 182, 141 P.3d 526 (emphasis added), *overruled on other grounds by State v. Swick*, 2012-NMSC-018, 279 P.3d 747, ¶ 31.

{19}     When a defendant claims self-defense at trial, like Defendant did here, their actual apprehension of injury from the victim is an essential element of the claim. *See id.* However, a victim's prior violence conduct "is not an essential element of a defendant's claim of self-defense, but rather circumstantial evidence that tends to show that the victim acted in conformity with [their] character on a particular occasion." *Id.* It follows then that under Rule 11-404(B), only reputation or opinion evidence—and not specific instances of past violent conduct—should be admitted to show that a victim was the first aggressor, causing a defendant to act in self-defense. *Armendariz*, 2006-NMSC-036, ¶ 17.

{20}     To the extent that Defendant urges this Court to use a more "lenient" application of this standard to the facts before us, the precedent is clear: evidence of specific instances of a victim's prior violent conduct of which a defendant is unaware may not be admitted to show that the victim was the first aggressor when a defendant is claiming self-defense. *See id.* Defendant had not met Victim before the night of the incident and had no knowledge of Victim's prior convictions or the actions that

underpinned them. Moreover, Defendant's assertion that by presenting evidence of Victim's prior convictions, the jury would have understood the "threat [Defendant] faced in the moment," is legally unsound given its failure to demonstrate Defendant's state of mind as a consequence of Victim's criminal history, which was unknown to Defendant.

**{21}** Because prior convictions or specific instances of past violent conduct are not admissible to show Victim was the first aggressor under the facts of this case, we hold that the district court did not abuse its discretion in denying Defendant's request to introduce such evidence.

## C. Crime Scene Specialist Testimony

**{22}** Defendant argues that the district court erred in permitting Albuquerque Police Department (APD) Crime Scene Specialist Amanda Carrillo to testify as a lay, and not an expert, witness as to bullet impact photos depicting on Victim's vehicle after it was fired upon. The State argues Ms. Carrillo's testimony was properly admitted as that of a lay witness.

**{23}** Ms. Carrillo testified at trial that she has been a crime scene specialist with APD for two and a half years and had undergone extensive training to specifically identify firearm and ballistic impacts on vehicles. At trial Ms. Carrillo was presented with the photos she had taken of Victim's vehicle at the crime scene and identified

what she perceived to be impact from a firearm on the driver's side headlight and the rear passenger side door.

**{24}** Whether lay opinion testimony is admissible requires a two-step analysis. First, the court must find that the opinion is based on personal perception or personal observation by the witness. *Hansen v. Skate Ranch, Inc*., 1982-NMCA-026, ¶ 22, 97 N.M. 486, 641 P.2d 517. Second, the opinion must be rationally based on the witness's own perception or observation. *Sanchez v. Wiley*, 1997-NMCA-105, ¶ 17, 124 N.M. 47, 946 P.2d 650. The content of such testimony "is generally confined to matters which are within the common knowledge and experience of an average person." *State v. Winters*, 2015-NMCA-050, ¶ 11, 349 P.3d 524 (internal quotation marks and citation omitted).

**{25}** Testimony presented by law enforcement officers is often informed by technical or other specialized knowledge obtained through the officer's professional experience. *State v. Vargas*, 2016-NMCA-038, ¶ 16, 368 P.3d 1232. Such "training and daily interactions undertaken by law enforcement officers are not part of the common knowledge and experience of an average person. *Id.* ¶ 16 (internal quotation marks and citation omitted). However, law enforcement officers regularly make observations in the course of their professional duties, such as the speed of an automobile, that are proper lay opinion testimony from either an officer or a casual observer. *See id.* ¶ 23 (noting that an officer's characterization of "marks as stun gun

injuries" is far afield of knowledge an ordinary person would possess). With this in mind, we conclude Ms. Carrillo's testimony did not constitute expert opinion because it was centrally based on her personal perceptions. Ms. Carrillo's testimony regarding the photos that comprised her report, while informed by her professional experience, did not characterize the marks on Victim's vehicle as firearm impact differently than would a normal person on the basis of the same observed facts. *See State v. Luna*, 1979-NMCA-048, ¶ 19, 92 N.M. 680, 594 P.2d 340 (stating that a lay opinion entails a "rational connection between the observations made and the opinion formed," which is present when such is consistent with an opinion that "a normal person would form on the basis of the observed facts").

{26}     As the State acknowledges, there is no New Mexico authority to address whether testimony as to whether the damage to the metal of a motor vehicle has the appearance of a being a bullet impact constitutes lay or expert testimony. The State asks this Court to consider out-of-state authority, in which other courts have concluded the identification of bullet impact evidence does not require expert testimony. We agree with those jurisdictions.

{27}     The most recent case to discuss this particular issue—identification of bullet impact evidence from a photograph admitted at trial—comes from the Court of Appeals of Arkansas, in *Doll v. State*, 598 S.W. 3d 47 (Ark. Ct. App. 2020). In *Doll*, a detective was called to testify about the evidence he collected and photographs he

had taken at the victim's home following a violent altercation between the victim and the defendant. *Id.* at 53-54. The jury was presented with a photograph of a bullet hole on the inside of a bedroom closet where the victim hid from the defendant. *Id.* The defendant argued that testimony of bullet trajectory requires specialized knowledge that is "beyond the ability of the jury to understand and draw its own conclusions." *Id.* at 54. While the court in *Doll* acknowledged that generally proper expertise is required for testimony pertaining to bullet trajectory, it ultimately ruled in pertinent part that this was not expert testimony and the jurors presented with the photograph could reach their own conclusion about what it depicted stating that "[n]o specialized training was required for a person to see the position of the [s]heetrock and paint around the hole in the photograph." *Id.* at 55.

{28}    As well, the State points to the Colorado Court of Appeals decision in *People v. Caldwell*, 43 P.3d 663, 667-68 (Colo. App. 2002). In *Caldwell*, a former police officer and crime scene technician was called to testify regarding the photographs and evidence he collected after the defendant had shot at a sheriff's deputy while the deputy was attempting to stop the defendant's vehicle. *Id.* at 667. The photographs depicted "bullet holes, fragments, and the dowel and string used by the technician" at the crime scene. *Id.* The defendant objected to these photographs and to the testimony arguing that "such testimony was of a scientific nature, beyond the common experience of the jury." *Id.* Similar to the court in *Doll*, the court in

*Caldwell* acknowledged that typically expert testimony is required when introducing ballistics evidence, however the testimony of the former police officer included only his observations about the entry locations of the bullet holes and the path they traveled inside the vehicle, and therefore was not expert testimony. *Id.* at 667-68. The court noted, "No special expertise is required to look at the hole made by the bullet and realize it followed a straight-line path." *Id.*

{29}    We find the facts of the aforementioned cases similar to the facts herein. It is well established from the record that Ms. Carrillo's testimony pertaining to the photographs at the crime scene were a product of her personal observation. *See Vargas*, 2016-NMCA-038, ¶ 15 (stating that courts must find that the opinion offered is based on "personal perception or personal observation" and "must be rationally based on the witness's perception or observation"). Ms. Carrillo testified that she is not an expert on firearms, but has been trained to look for and identify the type of damage caused by firearms. Just as in *Doll* and *Caldwell*, Ms. Carrillo's opinion was not based on scientific knowledge or expertise but rather her lay opinion, buttressed only by her training in this particular field of firearms and gun markings. We choose to adopt a similar standard as in *Doll* and *Caldwell*, and recognize that an average person too is able to perceive the markings of bullet holes on a car without any expert knowledge of bullet trajectory, ballistics, or firearms. Unlike in *Vargas*, where injuries identified by a prosecution witness as having been produced by a stun gun

would not have been so characterized by a "normal person . . . on the basis of observed facts," particularly when a different origin of the marks at issue was asserted by the defendant, *Vargas*, 2016-NMCA-038, ¶ 23, the bullet marks here are well within the awareness of a nonexpert to recognize, and in any event no alternative explanation was presented at trial other than that the marks came from the gun discharged by Defendant in the direction of Victim's vehicle.

{30}     Regarding Defendant's challenge to the admission of the photographs themselves, we perceive no abuse of discretion by the district court. *See State v. Pettigrew*, 1993-NMCA-095, ¶ 10, 116 N.M. 135, 860 P.2d 777. In overruling Defendant's objection to their admission, the district court noted that the photographs were a part of the initial police report surrounding the incident. Even if we were to assume impropriety in the admission of the photographs, they are slight in comparison to the other admitted evidence supporting his conviction, most notably the surveillance footage showing Defendant repeatedly shooting at Victim's car. *See State v. Baros*, 1974-NMCA-127, ¶ 6, 87 N.M. 49, 529 P.2d 275 (holding that the admission of a particular photograph was harmless error in light of overwhelming evidence in support of the defendant's conviction).

## III.    Vindictive Prosecution

{31}     Defendant contends that the district court erred in denying his motion to dismiss on grounds of vindictive prosecution. We review claims for prosecutorial

vindictiveness de novo. *State v. Brule*, 1999-NMSC-026, ¶ 6, 127 N.M. 368, 981 P.2d 782. However, where claims in which factual issues are intertwined with a district court's legal analysis as to prosecutorial vindictiveness, we review the district court's factual determinations under the "deferential substantial evidence rule." *Id.* (noting that the deferential substantial evidence rule applies because "the district court plays an important role in ferreting out evil prosecutive motives [which] . . . often turn on the facts of the case." (internal quotation marks and citation omitted)).

{32}    "[T]o establish a claim of vindictive prosecution, the defendant must show either: (1) actual vindictiveness or (2) a reasonable likelihood of vindictiveness, which then raises a presumption of vindictiveness." *Id.* ¶ 10 (emphasis, internal quotation marks, and citation omitted). If a defendant establishes either prong, the burden then shifts to the state "to justify its decision with legitimate, articulable, objective reasons." *Id.* (internal quotation marks and citation omitted). The central inquiry is whether the prosecutor committed an act "that would not have occurred but for hostility or punitive animus toward the defendant because he exercised a specific legal right." *Id.* (alteration, emphasis, internal quotation marks, and citation omitted).

{33}    Prior to trial, Defendant moved to disqualify the district attorney's office from prosecuting his case due to a conflict of interest. Shortly thereafter, the NMDOJ was

assigned to take over prosecution of Defendant's case, and filed the superseding grand jury indictment, adding charges in a superseding indictment in addition to those for which Defendant was previously indicted by the district attorney's office. Defendant then filed a motion to dismiss for vindictive prosecution, contending that his motion to disqualify the district attorney's office, considered along with statements made by certain public officials to the media regarding the Market, caused the NMDOJ to bring the superseding indictment. The district court denied the motion.

{34} On appeal, Defendant asserts that the superseding indictment is evidence of prosecutorial vindictiveness by the NMDOJ, reiterating the reasons stated in his earlier motion to dismiss. The State answers, and we agree, that Defendant has failed to demonstrate either actual or presumptive vindictiveness by the prosecution to a degree sufficient to shift the burden to the State to justify its decision to seek the superseding indictment. *See id.* ¶ 10; *State v. Coffin*, 1999-NMSC-038, ¶ 47, 128 N.M. 192, 991 P.2d 477. In reviewing Defendant's belief that there was vindictive prosecution by the NMDOJ generated by negative media attention surrounding the Market, we are unpersuaded. Defendant points to statements of Albuquerque Mayor Tim Keller and former Albuquerque Chief of Police Harold Medina regarding a separate civil lawsuit brought by the City of Albuquerque (the City) against the Market. The State responds that the NMDOJ has no interest in civil matters being

pursued by the City against the Market, and Defendant has not provided evidence of the contrary before this Court.

{35} Defendant's other notion that the NMDOJ brought the superseding indictment to "punish" him because he moved to disqualify the district attorney's office is unsupported both by the record and state case law. In its motion to dismiss, the district court acknowledged that it is not wholly unusual for the State to pursue additional charges after filing a criminal complaint, nor is the State required to "press the severest charges possible at the outset" of prosecution. *See State v. Stevens*, 1981-NMSC-094, ¶ 18, 96 N.M. 627, 633 P.2d 1225 ("Imposition of a pretrial presumption of vindictiveness would interfere with proper prosecutorial discretion. . . . Prosecutors might feel compelled to press the severest charges possible at the outset, to the detriment of defendants."). The district court further acknowledged that grand jury indictments traditionally offer defendants some degree of protection against "improper prosecutorial activity." *Id.* ¶ 20.

{36} We cannot accept Defendant's characterization of the filing of the superseding indictment by the NMDOJ as retaliatory under the facts of this case. *See Coffin*, 1999-NMSC-038, ¶ 47. Accordingly, we affirm the district court's determination that Defendant's claim of vindictive prosecution on the part of the NMDOJ is without merit.

## V.    Sufficiency of the Evidence for Conspiracy

**{37}**    We lastly address Defendant's claim that the State failed to present sufficient evidence to support his conviction for conspiring to commit tampering with evidence. Defendant argues that the State failed to present sufficient evidence to prove that there was an agreement between him and another person to commit tampering and that he intended to commit tampering. Specifically, Defendant contends that the testimony at trial, including his own, did not establish a conspiracy to tamper with the evidence and that the State speculatively relied on circumstantial aspects of the video surveillance evidence to suggest otherwise to the jury.

**{38}**    "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). Our task is to determine whether, on careful scrutiny of the record, "*any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *State v. Garcia*, 1992-NMSC-048, ¶ 27, 114 N.M. 269, 837 P.2d 862. When reviewing the record, we view the evidence in the light most favorable to the jury's verdict, remaining cognizant that "the jury is free to reject [the d]efendant's version of the facts." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted).

{39} To present sufficient evidence for the jury to convict Defendant of conspiracy to commit tampering with evidence, the State was required, in relevant part, to prove beyond a reasonable doubt that "(1) [D]efendant and another person by words or acts agreed together to commit tampering with evidence"; and (2) "[D]efendant and the other person intended to commit tampering with evidence." *See* UJI 14-2810 NMRA. At trial, the State presented the surveillance footage from the incident. Aside from the actual incident, the footage shows that in the moments after the incident Ms. Sullivan and other people were picking up the shell casings fired from Defendant's gun. Defendant testified that while he did see others picking up the shell casings fired from his gun, they were not doing so at his request. Defendant further testified that he did throw a shell casing into the trash because he believed it to be just trash and not evidence of the crime.

{40} To be convicted of conspiracy, a defendant must have the "requisite intent to agree and the intent to commit the offense that is the object of the conspiracy." *State v. Gallegos*, 2011-NMSC-027, ¶ 25, 149 N.M. 704, 254 P.3d 655. However, "it is not necessary in order to establish a conspiracy to prove a formal agreement to accomplish the illegal act." *State v. Deaton*, 1964-NMSC-062, ¶ 5, 74 N.M. 87, 390 P.2d 966.

{41} As an initial matter, and as the State points out, the jury was not required to credit Defendant's testimony regarding the disposal of the shell casings, either by

him or others. *See State v. Smith*, 2025-NMSC-025, ¶ 18, 578 P.3D 1016 ("When reviewing the record, we view the evidence in the light most favorable to the jury's verdict, remaining cognizant that the jury is free to reject [the d]efendant's version of the facts." (internal quotation marks and citation omitted)). While Defendant testified that there was no agreement with others to dispose of the shell casings, the fact-finder could reasonably infer that circumstantial evidence surrounding Defendant's actions as well as the actions of some of others relating to the disposal shell casings amounted to tampering with evidence. *See State v. Trujillo*, 2002-NMSC-005, ¶ 62, 131 N.M. 709, 42 P.3d 814 ("The agreement [necessary to establish conspiracy] may be established by circumstantial evidence.").

{42} The State also was not required to present evidence of specific communications to prove conspiracy. Our courts have long acknowledged that "the agreement need not be verbal, but may be shown to exist by acts which demonstrate that the alleged co-conspirator knew of and participated in the scheme." *Id.* In the surveillance video, while inaudible, Defendant can be seen speaking to Ms. Sullivan, who then shortly thereafter appears to pick up shell casings from the ground. A few moments later, the surveillance video shows Ms. Sullivan collecting shell casings picked up by others and putting them into her pocket. From the testimony and exhibits presented, the jury could reasonably infer that Defendant communicated to others to dispose of the shell casings, and we defer to such reasonable inferences.

*See Gallegos*, 2011-NMSC-027, ¶ 45 ("The jury may therefore infer the existence of an agreement based on the defendant's conduct and surrounding circumstances, which raises at least the specter of conviction by guess and speculation.").

**CONCLUSION**

{43}    For the foregoing reasons, we affirm.

{44}    **IT IS SO ORDERED.**


_____
                                        **J. MILES HANISEE, Judge**

**WE CONCUR:**


_____
**SHAMMARA H. HENDERSON, Judge**


_____
**JANE B. YOHALEM, Judge**